THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EVELYN ARTHUR SEE, Plaintiff in Error.

*Opinion filed February 20, 1913—Rehearing denied April 2, 1913.*

1. ABDUCTION—*it is not necessary that the taking away be accomplished by force.* To constitute the crime of abduction of a female, under section 1 of division 1 of the Criminal Code, it is not essential that the taking away be accomplished by force, but any scheme or device by which a person interposes his will and personality between a girl and her home so as to induce her to leave her home or stay at some other place is sufficient, and the kind and extent of the seductive arts employed are not fixed by any absolute rule of law.

2. SAME—*in contemplation of law a daughter's home is at the parents' house.* In legal contemplation a daughter's home is at the house of her parents wherever she may be, so long as her situation is not rendered inconsistent with the attachments of home or parental control.

3. SAME—*consent or co-operation of abducted female is immaterial.* The consent of the abducted female to the abduction or co-operation on her part in carrying it out, or her knowledge or ignorance of the abductor's intention or purpose, are immaterial matters so far as the guilt of the abductor is concerned.

4. SAME—*consent of parents to abduction of daughter is immaterial.* Under section 1 of division 1 of the Criminal Code the crime of abduction is committed when the female is enticed from her home for the purpose of concubinage, and it is immaterial that her parents consented to the abduction.

5. SAME—*gist of offense of abduction under section 1 of division 1 of Criminal Code.* The gist of the offense of abduction under section 1 of division 1 of the Criminal Code is the unlawful intent and purpose with which the abduction was accomplished.

6. SAME—*it is not essential to the crime of abduction of female that illicit relations be proved.* If the accused has enticed a girl from her home for the purpose of concubinage it is not essential to the offense that illicit relations between them be proved, but evidence of such relations is admissible as bearing upon the question of the intent and purpose of the accused.

7. SAME—*accused is guilty of abduction although concubinage was only in contemplation.* Under section 1 of division 1 of the Criminal Code, if a person entices a girl from her home for the purpose of concubinage he is guilty of the offense of abduction even though the act was only in contemplation and the girl was not then aware of his intent.

8. SAME—*religious liberty does not include violating the law.* The fact that the accused, in enticing a girl from her home for the purpose of concubinage, may have been sincere in his belief that he was carrying out the principles of a new religion promulgated by himself does not make him any the less guilty, as the religious liberty guaranteed by the constitution does not include liberty to violate the laws of the land.

9. CRIMINAL LAW—*it is not the law that the corpus delicti can not be proved by circumstantial evidence.* While it has been held that confessions are not sufficient to convict without other proof of the *corpus delicti,* it is not the law that the *corpus delicti* cannot be proved by circumstantial evidence.

10. SAME—*it is not the law that every fact in the chain of proof be established beyond a reasonable doubt.* It is not the law that unless every fact in the chain of proof is established beyond a reasonable doubt the entire chain must fall and verdict be not guilty.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

FRANCIS J. CALLAHAN, JAMES E. CALLAHAN, ROBERT E. CANTWELL, and SETH F. CREWS, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAY-
MAN, State's Attorney, (E. C. HALL, and FREDERIC BURN-
HAM, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the
court:

The plaintiff in error, Evelyn Arthur See, was indicted
in the criminal court of Cook county, and the second,
fourth, sixth and eighth counts of the indictment charged
him with enticing Mildred Bridges from her parents' house
for the purpose of concubinage. Upon a trial he was found
guilty as charged in those counts and the court sentenced
him to the penitentiary for an indeterminate term. The
record has been brought to this court for review in pur-
suance of a writ of error.

Section 1 of division 1 of the Criminal Code is as fol-
lows: "Whoever entices or takes away any unmarried fe-
male of a chaste life and conversation from the parents'
house, or wherever she may be found, for the purpose of
prostitution or concubinage, and whoever aids and assists
in such abduction for such purpose, shall be imprisoned in
the penitentiary not less than one nor more than ten years."

It was proved that Mildred Bridges left her parents'
house and lived with the defendant in his flat in Chicago.
The questions in dispute at the trial were whether she was
enticed by defendant, and if so, with what intent. Coun-
sel are agreed upon the following propositions of law:
First, that the enticing or taking away may be accomplished
not only by force, but by any scheme or device by which
a person interposes his will and personality between a girl
and her home so as to induce her to leave her home or
stay at some other place, and the kind and extent of se-
ductive arts which will satisfy the law do not depend upon
any absolute rule; second, that in legal contemplation a
daughter's home is the parents' house wherever she may be,
so long as her situation is not rendered inconsistent with

the attachments of home or parental control; third, that the consent of the abducted female to the abduction or co-operation on her part in carrying it out, or whether she was or was not aware of the abductor's intention or purpose, is immaterial; fourth, that the consent of the parents is immaterial, and the crime is committed when the female is enticed from home for the purpose of concubinage; fifth, that the gravamen and gist of the crime are the unlawful intent or purpose with which the abduction was accomplished. While these propositions of law are admitted, it is contended that there was no evidence that the defendant used any kind or extent of ·seductive arts or influence to induce Mildred Bridges to go to his house or stay there, or that his intent was unlawful.

The principal facts relating to the influence under which Mildred Bridges left her home and went to live with the defendant are as follows: For several years the defendant had been advocating and teaching a doctrine which he called "Absolute Life," teaching that by a process of elimination and development a new and perfect race of human beings without fault or default would be produced. He asserted that he had received revelations of the means of accomplishing that result, which he revealed to his followers; that he was acting as an agent of the "Spirit" in promulgating his theories; that Absolute Life was a new dispensation imparted to him by the Almighty by means of a new spirit,—the Spirit of Truth,—manifesting itself in him. He preached his doctrine on Sunday to a number of persons who attended his meetings, and the ultimate purpose of his preaching was the production of a new and perfect human race. The alleged revelations were also recorded by the defendant and compiled in a book called "The Book of Truth." His wife was engaged in a similar enterprise, but he disagreed with her and they separated in February, 1907, when the defendant went to the flat of one of his followers at 1151 Wrightwood avenue, occupied by Ida

Christensen and John H. Tock, who were afterward married. Felicia Blake Rees, a married woman separated from her husband, took an active part in the defendant's meetings and espoused his doctrines. She had a daughter, Mona Rees, whom she caused to come to Chicago to aid in completing the Book of Truth. Mona was taken to the Tock flat and then stayed with her mother awhile, but afterward settled at the flat with the defendant and Ida Christensen, John H. Tock and Tock's son. Mona was engaged in copying, in typewriting, the defendant's records of the alleged revelations and the theories of Absolute Life, which constituted the Book of Truth. Stephen H. Bridges and his wife, Lucille Bridges, had been, and were, followers of the defendant and contributed to the support of the cause. The defendant required that there should be a House of the Lord, and while the Tock flat answered for that purpose for a time, he wanted another, and in July, 1908, a flat at 2541 Racine avenue was selected for the occupation of the defendant and Mona Rees. At a meeting of the defendant's followers the question whether Mona Rees should live there alone with him was considered. Mr. Bridges objected, and said that a young girl had no business living with a married man alone and that her mother ought to go and live with her. The defendant said that Mrs. Rees was not ordained in the same kind of a life that Mona was; that Mona had to be there to fulfill her life with him; that he could not say that the mother should move into the home, because it was not his insight; that it was not Felicia whom the Life had provided to protect Mona, but it was Lucille. Mrs. Bridges had a home of her own where she had to stay, so that the defendant settled the matter that Mona should live with him alone. Mona was twenty-one years old and the defendant forty-seven, and they took up their abode together in the flat. Mildred Bridges was eleven years old when the defendant first became acquainted with her, and for some years she disliked him but she became a friend and inti-

mate of Mona Rees. In January, 1910, Mr. and Mrs.
Bridges went to Florida. Mrs. Bridges testified that Mil-
dred was left at the defendant's flat by her direction, but
Mr. Bridges testified that she was left in charge of Mrs.
Wheeler at the home of the Bridges at 1130 Wrightwood
avenue, just around the corner from the defendant's flat.
Mr. Bridges soon returned from Florida, and testified that
on his return he found Mildred at their home and after a
business trip again found her there, but on returning from
a second business trip he found her at the defendant's flat,
sick in bed. He had an altercation with defendant about
his daughter's presence there and the defendant's conduct,
and Mildred promised to go home. It turned out that she
had scarlet fever, and the house was quarantined and re-
mained so for some weeks. She came home after the quar-
antine was raised but did not stay, because, as she said,
there was too much mortality and perversion there so that
she could not make progress in her life. Afterwards she
came back home with the consent of the defendant, intend-
ing to remain, provided she would pursue Absolute Life.
She had a difficulty with her father about the defendant,
in which he called the defendant vile names, and she re-
fused to remain and went back to the flat. Mrs. Bridges
was entirely willing that Mildred should continue her re-
lations with the defendant and Absolute Life. She testi-
fied about his doctrines, and said that the first realization
and personal insight of the Life struck her all of a sudden
in 1905, as she was lying in bed; that it seemed to be a
deeper mind; that she came into an inspiration; that a new
life was born in her,—a new consciousness. What she de-
scribed was merely a sort of mental exhilaration which she
connected with the defendant in some way. In the Book
of Truth there was a statement which was interpreted in
a book subsequently published as applying to Mr. Bridges,
and as giving him the greatest opportunity offered to any
man in the Life as the benefactor of the Life in supporting

his wife and daughter in their places in the Life and in financially supporting the work of the Life. In the Book of Truth it was said that the Spirit had chosen him and had given him to her as her support, as her sanction for the freedom that she must know and in which she saw her right to fulfill all that was required of her. Mr. Bridges, however, was quite unwilling to accept the advantages which were offered him, and the relations between him and Mildred ended with the interview when she went back to the flat. That the defendant had great influence with Mrs. Bridges was clearly shown. She testified that she talked with him about her insight; that she was to be the representative of perfect motherhood, which was one of the five elements of the multiple Spirit defined by the defendant, and that she felt that she was picked from the universe for that purpose. She said that it was a spiritual thing; that she did not think she would ever be a concrete mother but would be the first one to receive the elements of spiritual motherhood.

The influence which the defendant acquired over Mildred was shown in numerous ways, and perhaps as well by a letter written by her as by other evidence. In this letter she said concerning a verse that she had written, "I am sure you know that I wrote it from the true spirit of wifehood that is in me," and wifehood was another of the five elements. She further wrote: "I would like also to have you know that my life is the Life's,—is yours. * * * From this day on I pick up my life on the basis of the real life which is in me. Know, dear, that the only purpose which is in me is to be the Life,—one with you,—your true wife forever. I do love you, Evelyn. I am trying so hard to be what my purpose is. * * * No matter where you may be, how busy you are, I am sure you may always know there is a little girl at home who is your wife, who loves you, and if you'll let * * * sends her verse 'To Husband.' With all the life and love in me, I am for-

ever your wife, Mildred." She explained this letter as not meaning anything such as the prosecution thought, and said that she loved the defendant as she would God, with the reverence of truth; that she loved the truth, and loved him because he taught her the truth; that she did not love him in a material or ordinary sense. Accepting that explanation as her understanding of what she wrote, it nevertheless shows the existence of a powerful influence which controlled her life. There can be no reasonable doubt that it was through the influence of the defendant, exercised directly and through her mother, that Mildred Bridges left her home and took up her residence with him and Mona Rees.

The next question is with what intent the defendant exercised his influence over Mildred Bridges so as to cause her to abandon her home and live with him. One method adopted for ascertaining intent was to offer evidence of actual occurrences indicating such intent. A neighbor testified that the first summer the defendant and Mona Rees lived in the flat, and before Mildred came there, she saw the defendant and Mona Rees in bed together early in the morning. The defendant did not testify and Mona Rees contradicted the witness as to the occurrence. The People introduced the testimony of police officers and newspaper reporters that the defendant and Mona and Mildred each had admitted, in the presence of the three police officers and five newspaper reporters, that illicit relations existed between the defendant and both Mona and Mildred. The defendant did not testify at the trial and Mildred denied both the alleged admission and the fact. Mona denied making the admission but refused to answer the direct question on the ground of privilege,—that her answer might tend to incriminate her. Of course, Mildred Bridges is entitled to have all the presumptions in her favor cast in the scale on her side, and it would be most unfortunate that her reputation should be unjustly affected by the testimony as to her alleged admission to the police officers and news-

paper reporters. · The evidence was admitted by the court after an examination out of the presence of the jury, and while it was not material whether any illicit relations were sustained or not, the evidence was competent as throwing light on the intent of the defendant. We would be very glad to give Mildred Bridges the benefit of her denial, and it is not necessary to base any conclusion upon the respective credibility of the witnesses as to the admission. If the defendant had the intent charged, he would be guilty although the act was only in contemplation and Mildred Bridges was not yet even aware of his intent.

The purpose and intent of Absolute Life and the doctrines promulgated by the defendant were clearly shown by his statements and publications, and the evidence brought Mildred Bridges directly within the scope of that intent. The teachings and ultimate aim of the defendant are the fairest and truest guide to his intent. The term "absolute life" conveys no definite meaning to the ordinary mind, but it was, perhaps, not a misnomer or inappropriate name for the doctrines and teachings of the defendant, from which nothing definite except the production of a new and perfect race can be gathered. The publications are collections of unmeaning declarations,—a mere jargon of words and a mixture of undefinable theories with only one end and aim, which is a new adjustment of the relation of the sexes and the production thereby of a new race. As the defendant did not testify in his own behalf, the jury were deprived of the benefit of any explanation that he might give of those expressions, which apparently mean nothing definite. The theories were explained, however, by Mrs. Rees, Mrs. Bridges, Mona and Mildred, and they simply talked about the deepest realization of life, the new consciousness, the newer and deeper mind, the fulfillments of life, and similar emotions or conditions which furnish no standard of either life or conduct. They meant nothing more than nervous and mental exaltation and intensity of

feeling and emotion. It was a part of the necessary economy of the new life that there should be a House of the Lord, where the chosen persons were to come by whom the Life was to be developed and perfected. There were to be certain primary elements personalized by those who were to dwell in the House of the Lord, and these elements were wisdom, wifehood, motherhood, meekness and purity of meekness,—the element of fatherhood apparently being overlooked in the scheme, unless it was represented by wisdom, which was personalized by the defendant. It appears from what was before stated, that Mrs. Bridges thought for a time that she was to represent motherhood, but afterward the defendant declared her in default, and she herself found that there was too much mortality and perversion in her. The new Spirit was to be the messenger of the new time to abolish mortality and perversion, but when the defendant came to anything definite it was something about the relation of the sexes. The Book of Truth makes numerous allusions to some person who is to fulfill the work of Absolute Life. In the later work these are applied to Mildred Bridges, and, indeed, they would naturally be applied to her. She is described as the chosen one of the defendant; his treasure; the idol of his heart; the wife of his life and the wife of his spirit. That she was the one intended is shown by the statement that the life which she once rejected, which later she tolerated and which afterwards she accepted, had in the last days of the opening of the new dispensation come to be her whole living, her whole way of thought, her whole interest. The book is filled with high-flown effusions having no coherence or sequence, describing her beauty, sweetness and grace, which are just the sort of thing to attract an emotional, impressionable and sentimental girl seventeen years of age at the time of the trial. Much of the discussions of the relations of the sexes is so extremely plain in its language as to make it unsuitable for these pages, but the sex relation is the central idea and

258 — 1'

purpose of all of defendant's writings and teachings. Under the head of personality he says: "Whatever has taken place, in the incoming of Absolute Life, that cannot be recorded without being misunderstood by the mortal world, in the midst of which those things must come, will be reported from person to person, among those who have the right to hear and are able to understand. From generation to generation those things shall be known, the deeper truth of God's way being conveyed without subjecting them to the criticism and prejudice of the world." The practice of the defendant was the well known and usual one of those who attempt to inaugurate new and eccentric systems of so-called religions, who collect about them girls and women, not of the coarse, gross or vulgar sort, but of emotional natures, to whom their theories are attractive. Such persons furnish a fertile soil for implanting their doctrines. There was to be a period of incubation in the House of the Lord for five years, and upon the full development of Absolute Life and the coming of the new dispensation the old order of things was to pass away; but it seems that the defendant could hardly have expected that result from nesting in a flat with two girls for a few years. Rather it would appear that he was making a religion for a couple of girls and their mothers than for the world at large.

It is immaterial whether the defendant was an impostor or sincere in his beliefs, so far as they did not conflict with the laws of the land. He had a perfect right to believe in any theory of spiritual life that he saw fit and to preach and teach it. Absolute religious liberty is guaranteed to the citizen, but he is not permitted to violate the laws of the land under the guise of a new religion. Whether the defendant was a dissembler, hypocrite, pretender and humbug or the sincere advocate of a new religious doctrine is immaterial to the question of his guilt or innocence. The ultimate object of establishing the home of the work and the House of the Lord and inducing Mil-

dred Bridges to live there and remain away from her home was the develpoment of the defendant's theories for the production of a new and perfect race. There is no evidence, nor even a suggestion, that this end was to be attained except through him and his immediate disciples and followers, consisting of two girls and their mothers. The evidence was sufficient to show that defendant influenced Mildred Bridges and fascinated her in a way to attract her from her home with the intent forbidden by the statute.

The instruction on circumstantial evidence which is given in almost every criminal case was given to the jury and is objected to on the ground that the *corpus delicti* can not be proved by circumstantial evidence. It has been held that confessions are not sufficient to convict without other proof of the *corpus delicti,* (*Andrews* v. *People,* 117 Ill. 195; *Bartley* v. *People,* 156 id. 234;) but it is not the rule that the *corpus delicti* cannot be proved by circumstantial evidence. (*Campbell* v. *People,* 159 Ill. 9; *People* v. *Cotton,* 250 id. 338; 12 Cyc. 488; 7 Am. & Eng. Ency. of Law,—2d ed.—863; Elliott on Evidence, sec. 3046.) The indictment contained counts charging the defendant with contributing to the delinquency of Mildred Bridges. An instruction was given on the subject, which is objected to because there was no evidence on which to base it. The jury acquitted him of the offense of contributing to delinquency and the instruction did no harm. Two instructions tendered by the defendant were refused and the refusal is complained of. One of them was not the law and it was not error to refuse the other. One of them told the jury that unless every fact in the chain of proof was established beyond a reasonable doubt the entire chain would give way and the verdict should be not guilty, and the other was a cautionary instruction not accurate in its language.

The judgment is affirmed.          *Judgment affirmed.*