THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WALTER HOTZ *et al.* Plaintiffs in Error.

*Opinion filed December 17, 1913—Rehearing denied Feb. 5, 1914.*

1. CRIMINAL LAW—*when motion to be set at liberty is properly denied.*  A motion by the defendants to be set at liberty because they have not been speedily brought to trial is properly denied if it appears the delay which resulted in the failure to try the defendants within the time prescribed by section 18 of division 13 of the Criminal Code was occasioned by them; and it must affirmatively appear that the restrictions which the statute places on the right to be released do not apply.

2. SAME—*when all the defendants are guilty if one is guilty.*  Where the evidence shows an agreement and understanding among the defendants to commit an abortion, which resulted in death, the guilt of all must be regarded as established if the evidence is sufficient to prove the guilt of one.

3. SAME—*corpus delicti in murder consists of two elements.*  The *corpus delicti* in murder consists of two elements: the fact of death, and the criminal agency of another as the cause of the death; and where the fact of the death is proven by direct evidence the criminal agency of the defendants may be established by circumstantial evidence.

4. SAME—*statement of one conspirator is admissible against all.*  Where the evidence in a murder trial clearly shows an agreement and understanding upon the part of all the defendants to commit an abortion, any statements by one conspirator in furtherance of the common design is admissible against all.

5. SAME—*when the proof of possession of instruments by one defendant is admissible.*  On the trial of several defendants for committing an abortion resulting in death, it is proper to admit evidence of the possession by one defendant of instruments commonly used in producing abortions and of his statements with reference to his possession and use of them; and the rights of the other defendants are sufficiently protected by an instruction limiting such evidence to the particular defendant whose guilty knowledge and intent are thereby shown.

6. SAME—*when statement in presence of defendant is properly admitted without affirmative proof that it was heard.*  A damaging statement made by one defendant in a conversation in the presence of another is properly admitted against the latter, who was in the same room, lying on a bed, and who had not taken any part in the conversation for over an hour, even though there is no af-

firmative proof that she was awake, where she does not claim that she was asleep at any time while she was lying on the bed but merely denies that she heard the statement made.

7. SAME—*what statement by deceased is not admissible.* On the trial of several defendants for murder in committing an abortion resulting in death, a statement claimed to have been made by the deceased to a physician several days before the crime was committed, and which it is claimed would show she had injured herself while doing some heavy work, is hearsay evidence, only, and is not admissible.

8. SAME—*what not admissible as a dying declaration.* A statement made by a woman dying from the effect of an abortion, the effect of which statement would be to exonerate the defendants, is not admissible as a dying declaration, where it appears from the testimony of the physician to whom it was made that the woman was very frail, mentally and physically, and that he doubted seriously whether she could comprehend that she was dying.

9. SAME—*it is for the court to determine the admissibility of a dying declaration.* It is for the court, in the first instance, to determine the admissibility of alleged dying declarations upon proof of the condition of mind of the declarant at the time they were made, and if the proof does not satisfy the court, beyond a reasonable doubt, that they are dying declarations within the law they should not be permitted to go to the jury.

10. SAME—*when rule as to dying declarations must be applied with strictness.* The fact that the commission of an abortion is ordinarily at the solicitation of the mother and under her promise of secrecy to those committing the crime makes it important that the rules of law respecting dying declarations be strictly applied to statements by her attributing her illness to overwork, thereby exonerating all persons, including herself, from wrongdoing.

11. SAME—*what evidence is properly excluded as mere hearsay.* An alleged statement of a dying woman to the witness as to what she had told a physician a few minutes before with reference to her condition has none of the elements of a dying declaration but is mere hearsay evidence, and is not admissible.

12. SAME—*what is a proper question to test opinion of physician.* Where a physician testifies, in a murder trial, that in his opinion the death of the decedent resulted from natural causes, thus exonerating the defendants of the crime of committing an abortion upon her, he may be asked, on cross-examination, whether he made a statement in the presence of certain witnesses indicating that he believed that an abortion had been committed, and if he denies making such statement the persons named may be called to testify that he did make it.

13. SAME—*counsel for prosecution should not address remarks to a defendant personally.* In argument to the jury counsel for the prosecution has a right to characterize the defendants and their acts in any manner which is justified by the evidence, but it is not proper for counsel to direct his abusive remarks to the defendants personally.

14. SAME—*when instruction as to producing abortion by any means is proper.* An instruction stating that if the defendants, "by means of any instrument or other means whatever," produced an abortion upon the woman named, and that such abortion was not necessary for the preservation of her life, and that she died as a result thereof, then the defendants would be guilty of murder, is proper, even though there is no proof to show that the abortion was produced by any means except an instrument, where it is also shown that the defendants had formed a common understanding to produce an abortion upon the woman and that the latter did abort or miscarry and died as a result thereof.

VICKERS, J., dissenting.

WRIT OF ERROR to the Circuit Court of Effingham county; the Hon. ALBERT M. ROSE, Judge, presiding.

RICHARDSON & WHITAKER, for plaintiffs in error.

P. J. LUCEY, Attorney General, and BYRON PIPER, State's Attorney, (R. C. HARRAH, and PAUL TAYLOR, of counsel,) for the People.

Mr. CHIEF JUSTICE COOKE delivered the opinion of the court:

Plaintiffs in error, Walter Hotz, Manford C. Butler and Anna Struck, were convicted in the circuit court of Effingham county for the murder of Minnie Madge. Hotz and Butler were each sentenced to be confined in the penitentiary for a term of twenty years and Anna Struck was sentenced to confinement in the penitentiary for a term of fourteen years.

The first ground relied upon for reversal is, that the court erred in overruling the motion made by Hotz and Butler to be set at liberty. On May 4, 1912, Butler was

arrested and committed to the county jail of Effingham county under a coroner's warrant which was issued as the result of an inquest which had been held to inquire into the death of Minnie Madge. Thereafter, on May 6, Hotz was arrested and committed to jail under the same warrant. Hotz and Butler were held without bail and remained in jail until their trial, in March, 1913. The first term of the circuit court after the arrest and commitment of plaintiffs in error convened October 12, 1912. On October 24, 1912, an indictment was returned by the grand jury charging plaintiffs in error and one Tillie Struck with murder, it being alleged in each count that plaintiffs in error and Tillie Struck did, on April 28, 1912, while Minnie Madge was pregnant with child, cause a miscarriage which resulted in her death, some of the counts alleging that the crime was committed with certain instruments and others that the miscarriage was induced by the administration of abortifacient drugs. On October 28 Hotz and Butler made application to be admitted to bail. On the following day court adjourned until December 9, and on December 23, after evidence had been heard thereon, the motion to be admitted to bail was denied. In the meantime, on December 17, the plaintiffs in error filed their motion for a change of venue from Effingham county, supporting the motion by affidavits. On December 30 the court set the hearing upon this motion for February 1, 1913. On that day (the State's attorney having in the meantime obtained and filed numerous affidavits in opposition to the motion for a change of venue) plaintiffs in error withdrew that motion, and there were then filed three motions,—one by Tillie Struck for a separate trial and continuance on the ground of sickness, one by Hotz and Anna Struck for a separate trial from their co-defendants, and one by Butler for a severance and separate trial from his co-defendant Tillie Struck, on the ground that she was then sick and unable to be present at the October term. None of these motions for separate trials

were passed on at the October term, but on that day, February 1, the court made an order reciting that the business of the October term had been finished and adjourning court in course. The March term convened March 17, 1913, and on that day Hotz and Butler filed the motion to be set at liberty on the ground that they had not been tried within the time prescribed by section 18 of division 13 of the Criminal Code and that the delay had not happened on their application. At the hearing upon this motion the record showing the various motions made by plaintiffs in error in the case at the October term was produced, and in addition thereto the People offered testimony tending to show that within a few days after the indictment was returned, and before any of these motions had been made, a conference was had with the presiding judge, Hon. Thomas M. Jett, in a room adjoining the court room, at which the State's attorney and the attorneys for the plaintiffs in error were present, plaintiffs in error being at that time in the court room; that the attorneys for plaintiffs in error, on behalf of their clients, there stated that they could not be ready for trial at the October term, and it was agreed and understood among all the parties present that the cause would not be ready for trial and would not be tried at that term but would be continued, and that the attorneys for plaintiffs in error requested that no entry of continuance be made of record until after the motion which they then intended to make to admit Hotz and Butler to bail should be determined. In opposition to this plaintiffs in error offered testimony to show that no agreement for continuance had been entered into, although it was admitted that other matters testified to by witnesses for the People had been discussed. Hon. Thomas M. Jett was the judge presiding on February 1, when the order was entered reciting that the business for the October term had been completed.

It is not error to deny a motion to be set at liberty if it appears that the delay which resulted in the failure to try

the prisoner within the time prescribed by this section of the statute was occasioned by him, and it must affirmatively appear that the restrictions which the statute places upon the right to be released do not apply. From the time that Hotz and Butler were indicted until the adjournment of the October term dilatory motions on their behalf were pending. Court was in session during eight days in the month of October, when it adjourned until December 9. Eight days thereafter the motion for a change of venue from the county was filed. On December 30 the court set the hearing upon this motion for February 1, 1913. This was not an unreasonable time in which to allow the State's attorney to secure affidavits to rebut those filed in support of the motion. When the matter was reached for hearing on February 1 counsel withdrew the motion and immediately filed three motions for separate trials and for a continuance on behalf of Tillie Struck. Up to this time the prosecution had been in no position to demand a trial. Such delay as had occurred had been occasioned wholly by Hotz and Butler. The October term had been prolonged by adjournment from December 30 until February 1 to afford plaintiffs in error a hearing on their motion for a change of venue. When that motion was withdrawn and other dilatory motions were immediately filed on behalf of the various plaintiffs in error, the presiding judge, presumably relying upon the statements of plaintiffs in error that they would not be ready for trial at the October term and upon their agreement that the cause should be continued, entered the order that all business for the October term had been finished and adjourned court for the term. Under these circumstances it cannot be held that the delay had not happened on the application of Hotz and Butler. The motion to be set at liberty was properly overruled.

The grounds set up by Hotz and Anna Struck in their motion for a separate trial were, first, that the testimony of certain witnesses whose names were given and the sub-

stance of whose testimony as it was given on the motion
to be admitted to bail was set up, would be offered by the
People as against Butler; that none of such testimony
would be admissible as against his co-defendants, and if
tried together such testimony would greatly prejudice the
defendants Hotz and Anna Struck with the jury and would
prevent them from having a fair and impartial trial; and
second, that the defendant Tillie Struck was sick and un-
able to attend the October term of court. At the March
term the court granted the motion of Tillie Struck for a
severance and continued the case as to her and overruled
the other motions for separate trials, and plaintiffs in error
were placed upon trial. The complaint as to the action of
the court in denying these motions and in admitting evi-
dence on the trial as to statements made by Butler are so
closely allied that they will be treated together. In order
to fully understand the matters involved in these conten-
tions, as well as the contentions that the *corpus delicti* was
not established and that the evidence is insufficient to sup-
port the conviction of Anna Struck, it will be necessary to
detail the facts proven on the trial.

Minnie Madge was an orphan girl, eighteen years of
age. She had lived with her grand-parents in Altamont
until she was sixteen years of age and then went to live
with her uncle, Conrad Stettbacher, who lived one-half mile
west and one-half mile south of the village of Moccasin, in
Effingham county. Walter Hotz spent the winters with his
father, who lived about a mile and a quarter north-west of
Moccasin, and worked away from home in the summer.
The village of Moccasin is the first station north of Alta-
mont on the Baltimore and Ohio railroad, and the village
of Beecher City is the first station on that road north of
Moccasin. Holland is the first station north of Moccasin
on the Chicago and Eastern Illinois railroad and is about
two miles north-east of Beecher City. About January 4,
1912, Minnie Madge went to Moccasin to work in the

home of a Methodist minister while he and his wife were
away. Hotz became acquainted with her on January 9
while she was staying in Moccasin and visited her fre-
quently during the month of January at the minister's house
and there had sexual intercourse with her, from which she
became pregnant. After her return home, and during the
month of February, she informed her uncle, Conrad Stett-
bacher, that she believed she was pregnant and went to Al-
tamont to consult Dr. G. M. Baker, the family physician.
Soon afterwards she again went to Altamont and was ex-
amined by Dr. Baker, who informed her she was pregnant.
After she had consulted Dr. Baker, Hotz met the doctor on
the street and asked him whether Minnie Madge had been
to see him that afternoon. Upon being informed that she
had, Dr. Baker informed Hotz, in reply to his questions,
that he thought she was pregnant but could not tell exactly
how long the condition had existed, and that he had advised
her to consult her relatives. Hotz then inquired whether
it would be dangerous to produce an abortion, to which
Dr. Baker replied that it would be. Hotz said that Minnie
wanted it done and wanted Dr. Baker to do it, to which
the doctor replied that it was a hazardous undertaking as
well as a serious crime and that he would not be involved
in anything of that kind for any consideration, and in re-
sponse to an inquiry as to what he would charge to produce
an abortion he replied that there was not money enough
anywhere to hire him to do such a thing. In that conver-
sation Hotz said that he had been told that it was not a
dangerous operation if done early, to which the doctor re-
plied that such was not the fact. Hotz inquired what the
danger was. Dr. Baker told him that the girl might die.
To this Hotz replied that if she died no one would know
anything about it, and upon the suggestion of Dr. Baker
that if she got seriously sick she was liable to tell about it,
he replied that she had promised him that she would not
tell and he thought she would keep her word. Dr. Baker

then informed Hotz that aside from the danger of punishment by law he would not do such a thing on account of the moral wrong, and that if Hotz was determined to bring about an abortion he did not want to hear any more about it, to which Hotz replied, "Well, if you won't do it I can get somebody that will." Hotz admitted that he had a conversation with Dr. Baker on this occasion but denied that the conversation occurred as detailed by the doctor. He admitted he inquired whether Minnie Madge had been to see the doctor and asked what her condition was, and that the doctor told him he was afraid she was pregnant; that he then asked the doctor whether anything could be done for her in case she was pregnant, and that the doctor replied that he did not know as there was and that it would be very dangerous to do anything of that kind at that time, and that he then told the doctor he was simply asking for advice, and just as they parted the doctor remarked that he hoped she would be all right, and that he expressed the same hope and said further, "I guess we are up against it and I guess we will have to do the best we can." Shortly afterwards Hotz went to Chenoa, in McLean county, and from there, on February 11, 1912, wrote Minnie Madge a letter, in which he said: "Any change yet, kid? I hope so, as I want to leave here in a week or so, if possible, so I am trusting you to do all you can to get right if you are not already. I do not want to write very much about this down there, but write and tell me all about it. * * * Let me know if your aunt will try and help you any, as I don't want to come back now if I can help it. Then I have only got a short time if I leave here when I want to. Want this straightened up first, though."

On February 16, 1912, Minnie's uncle, Conrad Stettbacher, took her to the State's attorney's office and she made complaint against Hotz for bastardy. A warrant was issued and he was arrested at Bloomington and taken back to Effingham county on February 20. A preliminary hear-

ing was held and he was required to give bond for his appearance at the next term of the county court, and on March 4 he appeared in the county court and gave bond as provided by law. On the day following the preliminary hearing, Minnie Madge and her uncle, Conrad Stettbacher, started to return home from Effingham by way of Altamont. Upon arriving at Altamont they went into the railway station. A few minutes later Hotz came in and asked Minnie to remain in Altamont over night, which she did. The following day she returned to her uncle's home near Moccasin. The next morning Hotz called upon Stettbacher and attempted to settle the matter. Stettbacher insisted that he marry the girl and take care of her, but Hotz wanted to make a money settlement. In this conversation Hotz remarked that if the matter went over until fall they would not be sure of getting anything. Later, on the same day, Hotz returned to see Stettbacher and another conversation was had, in which Stettbacher told Hotz that he did not want him to see Minnie any more unless he wanted to talk marriage. Hotz then asked permission to see Minnie, and this was granted. He talked with her for a short time and then left, and afterwards came frequently and talked with her until she left her uncle's home on March 16 and went to Moccasin to work at the home of the station agent of the Chicago and Eastern Illinois Railroad Company. She remained at this home something over a week and during that time Hotz called upon her. The station agent found them talking one day at the kitchen door and requested Hotz to leave, stating that he did not know the attitude of her relatives towards him. The agent testified that on this day, or about that time, Hotz bought a ticket to Holland.

Butler lived a short distance south-west of Holland. Anna Struck lived with her sister, Tillie, her brother, Philip, and her mother, about four miles north-east of Moccasin and near the village of Shumway. During the month of March and the fore part of April Hotz made several trips

to Holland and also to the Struck home. E. V. Dial, a merchant at Holland, testified that during the latter part of March Hotz and Butler met at his store and had a conversation; that they went out the back door just before the train went south; that after the train had gone Butler returned to the store, and when Dial inquired who that was with him, Butler replied that it was Hotz, and that he had a girl in the family way and wanted to get rid of it; that about a week later, when Butler was in Dial's store at night and it was raining, he said, "I dread my trip to-night," and upon being asked what he had to do, replied, "I am going to meet Hotz to-night on the track between Moccasin and Holland," and stated further that Hotz wanted him to help him out; that he told Butler he had better let that alone, to which Butler replied he would do anything for a friend. Charles Burke, a farmer residing near Holland, testified that in March, 1912, he saw Hotz get off the train at Holland and go to Butler's home; that shortly afterwards Hotz and Butler came into a store at Holland and stayed there until the train went south; that the witness walked down the street with Butler, and the latter told him that that was Hotz, and that he was in trouble with a girl and that he wanted to help him out,—that he would do anything to help a friend. Another witness, Hubbart, who lived west of Holland, testified that about the 10th or 12th of April, 1912, he had a conversation with Butler in which the latter told him that on the following night he was going to see Minnie Madge; that she was in the family way and he was going to "knock the kid" if he could; that afterwards, on April 18, Butler asked him if he didn't want to hire a girl, and upon being informed that he did, told him that he could get Minnie Madge, and that there was five dollars in it for the person who would go down and get her away from home.

Dr. A. L. Stringer, a dentist at St. Elmo, testified that during the latter part of March or the first of April, 1912,

he received a letter from Butler in which he stated that he had a friend who had a lady in the family way and asked the witness to come to Holland and help him out; that two or three weeks later Butler called on the witness between ten and eleven o'clock at night, at his home in St. Elmo, and told him that he had the lady he had written him about out in a buggy and asked him to go with him, which the witness refused to do and informed Butler that he would have nothing to do with the matter; that Butler inquired whether certain doctors living at St. Elmo would help him in the case and that the witness replied that he did not think they would; that about a week later the witness heard of the death of Minnie Madge.

After Minnie Madge ceased working for the station agent at Moccasin she returned to the home of Conrad Stettbacher and remained there until April 23, with the exception of one night which she spent at Altamont with her grandmother.

Butler was a single man and Anna and Tillie Struck were single women. For several years Butler had been going to the Struck home, and his acquaintance with Tillie Struck, at least, was intimate. Prior to April 23, 1912, neither Anna nor Tillie Struck had any acquaintance whatever with Minnie Madge. On Sunday evening, April 14, 1912, Butler drove from his home near Holland to the Struck home and had his supper there. After supper, accompanied by Anna Struck, he drove to the home of Conrad Stettbacher. When they arrived the family had retired, Minnie Madge being up-stairs. Stettbacher came to the door and had a conversation with Butler in which the latter said they were looking for a girl; that Mr. Turner, a neighbor of his, wanted a girl to work for him while his wife was sick. Charles Turner, referred to by Butler in this conversation, lived about two miles west of Holland and his family at that time was quarantined on account of scarlet fever. Butler further said to Stettbacher that he

had gone to the Struck home that afternoon to get one of
the Struck girls, but that one of them was sick and Anna
told him he might possibly get Minnie Madge. Stettbacher
told Butler that his niece could not go. Thereafter, in the
forenoon of April 23, Butler drove over from Holland to
the Struck home. Both Butler and Anna Struck testified
that Butler there exhibited a letter from Minnie Madge
which was read by Anna and Tillie Struck and then burned.
Butler remained at the Struck home while Anna took his
team and drove to the home of Conrad Stettbacher. She
reached there shortly before noon and told Mrs. Stettbacher
she wanted Minnie to go to Turner's home and stay there
while they were sick, and that she would like for her to
go for a week at least. Minnie, being present, said, "I be-
lieve I will go over for a week, and if I can't do the work
in the home for the sick I will come back." Without ob-
taining the consent of her uncle or aunt she then got in the
buggy with Anna Struck and drove away. The evidence
shows that when Minnie Madge left the Stettbacher home
with Anna Struck she was in good health. They arrived at
the Struck home about two o'clock. Butler was there when
they arrived and Anna Struck introduced Minnie to Butler
and went on into the house. Butler remained there for
more than an hour after their arrival and then left without
taking Minnie Madge with him. From the testimony of
Anna Struck and Butler it appears that after her arrival
at the Struck home nothing was said by Minnie or to her
by anyone about going over to the Turner home and neither
Butler nor Anna Struck said anything about taking her
there. Butler was at the Struck home on Thursday, April
25, and remained there day and night, with the exception
of Saturday, until Sunday evening, during all of which time
he took his meals at the Struck home and ate at the table
with Minnie Madge, but according to his testimony he did
not upon any occasion say anything about taking her to
Turner's. About three o'clock Monday morning, April 29,

Minnie Madge became ill and had a miscarriage about 8:45
o'clock that morning. Tillie and Anna Struck were both
with her.

Two witnesses testified that on the morning of April 29
they heard a telephone conversation between Tillie Struck
and Butler in which Tillie asked Butler whether he was
coming over that morning, to which he replied, "No, it is
raining;" that Tillie told him to put on his raincoat and
come over; that Butler inquired, "Is there anything do-
ing?" to which she replied, "If you was here you would
think there was something doing." Butler went over to
the Struck home that afternoon.

No physician was called on Monday and none of Min-
nie's relatives were notified of her condition. On Tuesday
afternoon Anna Struck went to Shumway after Dr. C. S.
Lorton. The only information she gave the doctor was
that there was a lady visiting at her home and that she was
sick and wanted him to go and see her. Dr. Lorton ar-
rived at the Struck home about four o'clock that afternoon
and was informed that Minnie had aborted the previous
day. Her condition then was serious. Anna and Tillie
Struck showed him the fœtus and part of the afterbirth in
an earthen vessel in an adjoining room, but the doctor did
not remove the fœtus from the vessel and made no exami-
nation of it, merely noticing, as he testified, that it was in
a decomposed condition. Upon learning that Minnie's rela-
tives had not been informed of her condition Dr. Lorton
told Anna and Tillie Struck to notify them. The doctor
returned the next morning and made another visit in the
afternoon, when he was accompanied by Dr. Haumesser,
of Shumway. They inquired whether Minnie's relatives had
been notified, and Anna and Tillie Struck replied that they
had not, as Minnie did not want them to send any word to
them. Dr. Haumesser insisted that they notify her rela-
tives and stated that she would probably die. That even-
ing Anna Struck drove over to Conrad Stettbacher's home

and stated to him, "Minnie had a mishap; it is going to cause lots of trouble; we know that you will blame us." Stettbacher asked whether they had called a doctor, and she replied that they had the previous evening. According to the testimony of Stettbacher and his wife, when asked why she had not called a doctor immediately, Anna replied that Tillie had had much experience in cases of this kind and she did not think it necessary to call a doctor. Immediately after Anna Struck left, Conrad Stettbacher went to Altamont, where he consulted Dr. Baker, the family physician, and arranged with him to attend his niece.

The condition of Minnie Madge continued to grow worse, and she died about ten o'clock in the evening of Thursday, May 2, from peritonitis. On the following day the undertaker embalmed the body and took it to Altamont. On May 4, 1912, the coroner, having been notified of the circumstances attending the death, empaneled a jury and called Drs. Baker, Lorton and Haumesser to make a post-mortem examination. This examination disclosed a puncture at the top of the womb, which the evidence for the People tended strongly to show must have been caused by an instrument inserted through the vagina into the womb during the lifetime of Minnie Madge, and which the evidence offered by plaintiffs in error tended to show might have been caused by the undertaker's trocar when the body was embalmed. The testimony of every physician who was called was to the effect that if this puncture in the womb was caused by the insertion of an instrument through the vagina and into the womb, death would result from blood-poisoning. Physicians on the part of the People who were present at the post-mortem examination testified that there were indications that nature had attempted to heal over this wound,—something that could not have occurred after death. Dr. G. M. Baker, who opened the abdomen and removed the womb at the post-mortem examination, and Dr. Cecil Baker, who was present at that examination,

both testified that the puncture in the womb must have been caused by an instrument inserted through the vagina before death, because a fold of the peritoneum had slightly adhered to the womb at the place of the puncture, showing an effort on the part of nature to heal the wound, and because if the puncture had been made from above after death there would also necessarily have been a puncture in the peritoneum at the point of adhesion, but that there was no puncture or hole in the peritoneum. One physician on behalf of plaintiffs in error gave it as his opinion that this puncture had been made with the undertaker's trocar, but the reasons given for this opinion are far from convincing. The undertaker described minutely the method employed by him in embalming the body, and if his testimony is to be believed it would have been impossible for the puncture to have been made by him.

On the night the coroner's jury returned its verdict Hotz left Springfield, Illinois, where he had been staying for some time, and proceeded to Pana, from which place the next afternoon he telephoned Anna Struck to meet him at Beecher City that night, which she did and took him to her home shortly before midnight. The other members of the Struck family had been arrested and were then confined in jail.

In addition to the above the People proved by several witnesses that Butler for over a year had had in his possession instruments commonly used for producing abortions, and the testimony of these witnesses tends to show that Butler had admitted having produced abortions with these instruments. Butler and Hotz both admitted their meeting at Holland, as testified to by the witnesses for the People, but testified that the object of those meetings was to consult about the bastardy bond. Hotz offered no explanation as to why it was necessary for him to consult with Butler instead of his attorneys about his bond. Butler also admitted having had conversations with Dial, Burke and Hub-

bart in Holland, but denied that those witnesses detailed those conversations correctly. He also admitted his presence at the Struck home while Minnie Madge was there, but says that he was engaged in doing some plastering there at that time. Neither he nor Anna Struck offered any explanation as to why Minnie Madge got no further than the Struck home on her supposed journey from Stettbacher's to Turner's. Butler also admitted having had a telephone conversation with Tillie Struck on the morning of April 29 in which Tillie requested him to come over to the Struck home, but denied that the witnesses for the People correctly detailed that conversation.

From the facts thus shown it will be seen that there was an agreement and understanding among plaintiffs in error and Minnie Madge to commit an abortion upon her, and if any one of plaintiffs in error is guilty they are all guilty. It therefore follows that there is no basis for the contention that the evidence is insufficient to support the conviction of Anna Struck.

The evidence was sufficient to show the *corpus delicti.* It has been said that the *corpus delicti* in murder consists of two elements, viz., the fact of death and the criminal agency of another as the cause of the death. (*Campbell* v. *People,* 159 Ill. 9.) The *corpus delicti* may be proved by presumptive or circumstantial evidence where that is the best evidence obtainable, although caution should be observed in acting upon it. (*Campbell* v. *People, supra; People* v. *See,* 258 Ill. 152.) The death of Minnie Madge was proven directly, and the other element necessary to complete the *corpus delicti* was proven abundantly by circumstantial evidence.

The court did not err in denying the motions for separate trials or in admitting testimony as to statements made by Butler in reference to his possession of instruments commonly used to produce abortions and his use of the same, and evidence as to his possession of such instruments

at a time prior to the illness of Minnie Madge. At the time this testimony was offered it was objected to. The court overruled the objections, and in doing so expressly limited this testimony to Butler alone, and later so limited it in the instructions given to the jury. This testimony was proper to show guilty knowledge and a particular intent on the part of Butler, (*Clark* v. *People,* 224 Ill. 554; *People* v. *Hagenow,* 236 id. 514;) and the instruction of the court limiting it to Butler, alone, was sufficient to protect the rights of his co-defendants. (*Clark* v. *People, supra.*) The various statements made by Butler while the affair was in progress, of his intent and desire to assist Hotz, and the substance of his letter to Dr. Stringer, were properly admitted. A conspiracy on the part of plaintiffs in error to commit the crime of abortion was clearly shown, and any statements made by one conspirator in furtherance of the common design is admissible against all.

During the course of the trial, and after the jury had been excused for the day, counsel for the plaintiffs in error complained to the court that the bailiff in charge of the jury had made improper remarks in the presence of the jury and asked to have him removed and another bailiff put in charge. The court thereupon heard the testimony of witnesses concerning certain statements alleged to have been made by the bailiff. E. H. Hubbart testified that he had a conversation with the bailiff the night before at a hotel in Effingham, in which the bailiff said the judge had told him that he would send all the defendants to the penitentiary; that in response to his reply that the judge was too smart for that, the bailiff responded, "I will bet you twenty-five dollars," but that he refused to bet. The witness did not know where the jury was at the time this conversation occurred. The bailiff admitted having had a conversation with Hubbart at the hotel, but he and another witness who was present and heard the conversation denied that he made the statements testified to by Hubbart. After

hearing this testimony the court remarked that he had
known the bailiff for several years; that this was the first
time he had ever heard any complaint about him; that he
believed he was honest and that he would permit him to
remain in charge of the jury. The court was satisfied that
there had been no wrongdoing on the part of the bailiff,
and he was justified in his conclusion from the evidence
produced.

    Numerous rulings of the court in admitting and exclud-
ing testimony are complained of. Emma Stettbacher, an
aunt of Minnie Madge, was one of the relatives who ar-
rived at the Struck home about an hour and a half before
she died. She remained there until the afternoon of the
following day. She testified that after Minnie had died she
was present in a room with Tillie and Anna Struck; that
Anna was lying across the foot of a bed and had been lying
there for about an hour; that she did not know whether
she was asleep or awake; that Tillie Struck and the wit-
ness were standing within a few feet of where Anna was
lying; that in response to a remark made by the witness
that she was so sorry that this had taken place there, Tillie
Struck said she was sorry also, and added, "But we want
you to understand that Minnie was willing to have this
happen; don't blame me for it." Anna Struck took no
part in this conversation and said nothing at the time this
statement is alleged to have been made by her sister. Coun-
sel for plaintiffs in error objected to this testimony, and
after it was admitted moved to strike it out for the reason
that it was made outside the presence of plaintiffs in er-
ror, and that as the witness had stated that she did not
know whether Anna was asleep or awake, and as she had
been lying on the bed for an hour or more and took no
part in the conversation, the presumption was that she was
asleep and heard no part of it. The court overruled the
motion and stated, "If the time ever comes that the evi-
dence shows she was sleeping then I will pass upon the mat-

261 — 17

ter." Anna Struck testified in her own behalf and was asked about this circumstance. She testified that Emma Stettbacher arrived there on Thursday evening about eight o'clock and remained there until half-past one the following afternoon. She was then asked if during the time Emma Stettbacher was there she heard any conversation between her and Tillie Struck in which Tillie stated, "You can't blame us, for Minnie was willing to have it done." This was objected to, and the court remarked that that was not the statement made by Mrs. Stettbacher. The question was withdrawn and another asked in which the exact statement testified to by Mrs. Stettbacher was embodied, and the witness testified that she did not hear any such statement made. The court then made this suggestion: "This statement that Mrs. Emma Stettbacher testified about happened after the death of Minnie, and she stated that the circumstances were that Anna was lying across the foot of the bed; that she did not know whether she was asleep or not." Thereupon counsel conducting the examination said he would ask about that. She then testified that after Minnie's death she remembered of Emma Stettbacher being there, and she also remembered at that time of lying across the foot of her bed. She was then asked to state whether, while she was lying across the bed, she heard this conversation between Tillie Struck and Mrs. Stettbacher, to which she replied she did not, and that she did not hear any such conversation as that in substance.

It is contended that this testimony was not admissible unless the statement was made in the presence of Anna Struck and under such circumstances that she was able to hear it, and that the presumption is, from the testimony of Emma Stettbacher, that Anna Struck was asleep when the statement was made. That presumption does not arise from the facts testified to by Mrs. Stettbacher. If Anna Struck was, in fact, asleep when it is testified this statement was made, and was therefore unable to hear it, this testi-

mony was inadmissible. Mrs. Stettbacher testified that she did not know whether Anna ·was asleep or awake, and the only circumstance from which it could be assumed that she was asleep was the fact that she had been lying across the foot of the bed for an hour and had taken no part in the conversation. Anna Struck, when placed upon the stand, testified that she remembered the circumstance of Mrs. Stettbacher being there and of the fact that she (Anna) was lying across the foot of the bed. The court had intimated to counsel during the examination of Mrs. Stettbacher that if it ever appeared that at the time this alleged statement was made Anna Struck was asleep he would again consider the motion to strike this testimony. When Anna Struck denied having heard this conversation the court sharply called the attention of counsel to the testimony of Mrs. Stettbacher as to when this conversation occurred and to the fact that Anna Struck was then lying across the foot of the bed, but she was not asked whether she had been asleep during any. of the time that she was lying on the bed when Mrs. Stettbacher was there. No one would know better than Anna Struck whether she had been asleep during any of that time. Her testimony disclosed the fact that she remembered distinctly of Mrs. Stettbacher being there and of the fact that she was lying on the bed. While she might not be able to state how long she had been asleep, or the time at which she went to sleep, or the time she awoke, if, in fact, she had been asleep during any of that time, she would have been conscious of it and could have testified to it. The statement testified to was a very damaging one and fraught with considerable danger to plaintiffs in error, but under all the circumstances as detailed by Mrs. Stettbacher and by Anna Struck herself while upon the stand, this testimony was admissible and the motion to strike was properly denied.

Dr. Lorton and Dr. Haumesser both testified on behalf of the plaintiffs in error. Each was asked to state whether,

after he was called to attend Minnie Madge, he got a history of the case from anyone, from whom he got it and what the history of the case was. The theory of the defense was that Minnie Madge died as the result of a miscarriage which was brought on by over-exertion, and it is evident that it was sought to be shown by these doctors that in giving them the history of the case Minnie Madge had told them that some days before the miscarriage, and while she was at Stettbacher's home, she had hurt herself by assisting in pushing a manure-spreader out of a shed or in spading in the garden. The court sustained objections to the questions which sought to elicit the fact as to whether Drs. Lorton and Haumesser had received a history of the case from anyone, and it is complained that this was error. This testimony was clearly incompetent. The only statement of Minnie Madge that could have been received in evidence, either for or against the plaintiffs in error, as to what caused her condition, would be one in the nature of a dying declaration. The testimony sought to be elicited from these witnesses would have been purely hearsay and was not competent.

During the examination of Dr. Lorton on this question it is claimed that the court made remarks which were prejudicial. Dr. Haumesser had been examined along the same line and the court had held that this evidence was not proper. During the examination of Dr. Lorton he was asked whether he got a history of the case, to which he replied that he did. He was then asked from whom he got it. To this question an objection was sustained. He was then asked what the history of the case was as he got it, to which an objection was also sustained. He was then asked whether he got the history from Minnie Madge. In sustaining an objection to that question the court reminded counsel that he did not want to sustain so many objections to the same question, informing them that it was all right to make a record but not necessary to repeat the question

four or five times in different ways. Counsel then asked
to be allowed to make an offer of proof. The jury were
directed to retire, but counsel stated that they had already
offered as far as they desired and that they simply wanted
to get it in the record. The court remarked that they were
entitled to have it in the record, and reminded them that
they had asked the other doctor at least a dozen questions
which amounted to the same question, and he did not want
it repeated. The witness was then asked whether he got a
history of this abortion from Minnie Madge. In sustain-
ing an objection to this question the court warned counsel
not to repeat that question in any other form and not to
compel him to speak to him any more about it. The re-
marks of the court were none too severe, and if they were
inclined to prejudice the jury it was the fault of no one
but counsel for plaintiffs in error. It is evident that they
were attempting, by repeatedly asking these questions, to
convey the impression to the jury that something was said
by Minnie Madge when she told the doctors about her ill-
ness that would exonerate plaintiffs in error of the charge
against them. The court properly ruled upon the objec-
tions, and the point was as well preserved with one ruling
as with a dozen.

Dr. Baker called to see Minnie Madge at the request of
Conrad Stettbacher, arriving at the Struck home a short
time before she died. Drs. Lorton and Haumesser arrived
there at the same time and they entered the house together.
Dr. Baker was the family physician of the Stettbachers and
had known Minnie Madge all her lifetime. He went into
the sick-room alone, closed the door and had a private con-
versation with her about the cause of her illness. He was
called by plaintiffs in error, who offered to prove by him
an alleged dying declaration of Minnie Madge. The jury
were excused, and he testified, upon preliminary examina-
tion, that after he had gone into the sick-room and closed
the door he talked to Minnie Madge on the subject of her

death; that he asked her if she realized that she was very sick, and she said yes, she thought she was; that he then asked her if she knew that she might die, and she said, "I am afraid I will," or, "I believe I will," and that he then told her he thought she was going to die and he would like for her to clear up this situation and tell how this trouble came on; that she said she didn't know; that he told her he believed she was going to die and that she couldn't afford to die with a lie on her lips; that if she didn't want to tell him the truth not to tell him anything, and that she said she would tell him the truth; that she then said, in answer to his questions, that she had not taken any medicine for the past two or three weeks except a little patent medicine before she came there, and that she had not taken anything since; that nothing had been done to her and that no instruments had been used that might have brought on the abortion; that she further told him that while spading in the garden a short time before she came to the Struck home she felt a pain in her right side, and that about the same time she pushed or pulled a manure-spreader and felt the same pain, but that since these occurrences she had felt as well as usual up until within the past day or two. In response to a question as to whether, in his opinion, she knew that she was dying at that time, the doctor replied that he doubted seriously whether she could comprehend that or not; that she was "very, very frail, mentally and physically." On his cross-examination he repeated that he doubted seriously whether her mind was in such condition that she could realize her condition, and stated that she was considerably dazed. The court then examined the witness, and he testified that her mental condition was just fair; that he was compelled to ask her the same question over repeatedly before he could get a response, but he thought that "right at the time" he had the question "right at her" she understood the question, but in a moment she was talking about something else and it was a difficult matter to

keep her on the subject; that he asked her the same question repeatedly because he did not think she understood what he said or what he wanted; that at that time one eye was open wider than the other as a result of extreme prostration; that during the time he was in there she would have short periods of unconsciousness, which would be succeeded by lucid intervals, and that in his opinion she was then dying. The court refused to permit this testimony to go to the jury, and this is complained of as error.

It is well settled that a dying declaration is admissible on behalf of the accused as well as on behalf of the prosecution, and in some jurisdictions it is held that the same strictness in regard to the preliminary proof will not be required when the declaration is offered in favor of the accused as when it is made against him. The first case wherein the rule in regard to the admission of dying declarations was defined in this State was *Starkey* v. *People,* 17 Ill. 17, and it is there stated that dying declarations are such as are made by the party, relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand. The principle upon which this rule is founded is there stated to be, that such declarations are made in a condition so solemn and awful as to exclude the supposition that the party making them could have been influenced by malice, revenge or any conceivable motive to misrepresent, and when every inducement, emotion and motive is to speak the truth,—in other words, in view of impending death and under the sanction of a moral sense of certain and just retribution. It was also held in that case,— and these holdings have been uniformly followed in this State,—that it is for the court in the first instance to determine upon the admissibility of the declarations upon

proof of the condition of mind of the deceased at the time they were made, and if the proof does not satisfy the court, beyond reasonable doubt, that they were made in extremity and that they are dying declarations within the law, they should not be permitted to go to the jury. The ordinary dying declaration is one charging the accused of killing the person making the declaration. That situation accounts for the rigor of the rule as laid down in the *Starkey case, supra.* There is some basis for the argument that the rule should not apply in all its strictness where the statement is of such a nature that it exonerates the accused. There are elements present in this case, however, which require that the rule be applied in all its strictness. Inducing an abortion under such circumstances as are disclosed in this case is made a crime in this State and those guilty are punishable by imprisonment in the penitentiary. All participating in the commission of the crime, including the mother, are guilty of a great moral wrong. Criminal abortions are necessarily committed at the solicitation and request of the mother, and it is a matter of common knowledge that the crime is usually, if not always, committed under a promise of secrecy by the mother. In making the statement she did to Dr. Baker, Minnie Madge might not only have been keeping such a promise, but she was exonerating herself from the charge of having committed a great moral wrong. Had she charged plaintiffs in error with having produced this abortion she would have stultified and disgraced herself. Considering what she herself had at stake and her own interest in a charge of this kind, it becomes important that there be present every element necessary to constitute her statement such a declaration as would be admissible in evidence in any event. The testimony of Dr. Baker is of such a character as to raise a serious doubt whether Minnie Madge was in such a mental state as to be able to realize her condition or to comprehend that death was imminent, or to form any rational conclusion on that subject

either from her own impressions or from anything that was
said to her by her physician as to her condition. No at-
tempt was made by plaintiffs in error to show by any other
evidence the mental condition of Minnie Madge at this par-
ticular time.

It is insisted that the court erred in not allowing Dr.
Haumesser to testify in regard to the mental condition of
Minnie Madge at the time Dr. Baker was there. Dr. Hau-
messer testified that he was present when Dr. Baker made
his diagnosis, but was not allowed to state any conversation
he heard at that time. He was asked several questions as
to her mental condition at that time and whether he heard
her say anything in reference to dying, to all of which ob-
jections were properly sustained because this examination
was in the presence of the jury. Finally, following a sug-
gestion by the court, the jury were sent out, and an effort
was then made to lay the foundation for the admission of
a dying declaration. The doctor then stated that he had
no conversation with the patient upon the question of her
death, and he was not asked his opinion as to her mental
condition during the absence of the jury. Moreover, this
testimony was given before Dr. Baker was called on behalf
of plaintiffs in error, and therefore, necessarily, before it
appeared that plaintiffs in error would attempt to prove a
dying declaration by Dr. Baker, and after Dr. Baker testi-
fied Dr. Haumesser was not re-called to the stand. It there-
fore did not appear that this testimony was offered for the
purpose of making preliminary proof for the introduction
of an alleged dying declaration made by Minnie Madge
to Dr. Baker. The offer to prove a dying declaration was
properly excluded.

Plaintiffs in error offered to prove by Anna Struck that
after Dr. Baker had left the Struck home Minnie Madge
detailed to her a conversation she had had with Dr. Baker,
stating that she had told Dr. Baker she believed she was
about to die and had told him her miscarriage had been

brought about as a result of her spading in the garden and the pushing of a manure-spreader. This offer partook of none of the elements of a dying declaration, but was simply an offer to prove what Minnie Madge is alleged to have said occurred between herself and Dr. Baker, and was properly excluded.

Dr. Lorton was one of the principal witnesses for plaintiffs in error and his testimony was quite favorable to their theory. He testified on direct examination that in his opinion this abortion was caused by exertion, and he explained that he meant by exertion any undue work or exercise by the mother. On cross-examination he was asked whether he did not state in the presence of four persons; (naming them,) three of them relatives of the deceased, at the Struck home immediately after the death of Minnie Madge, "I advise you to get this corpse out of here before daylight or there will be the greatest disturbance you have ever heard in this neighborhood." An objection to this question was overruled, and the doctor denied that he had made this statement. On rebuttal the persons named in the question as having been present when the statement was made testified that it was made by Dr. Lorton under those circumstances. It is now urged that this was prejudicial error for the reason that it was not a proper subject of impeachment. Dr. Lorton had testified that in his opinion the death of Minnie Madge resulted from natural causes, and in the expression of this opinion he wholly absolved plaintiffs in error from the charge under which they were being tried. He did not pretend to state that as a matter of fact this abortion resulted from exertion. He simply gave that as his opinion. In order to test the sincerity of that opinion the question asked was proper in the way of impeachment. If he made the statement credited to him immediately after the death of Minnie Madge it was proper to be considered by the jury in connection with his testimony as to his opin-

ion of the cause of her death, as the alleged statement was inconsistent with that opinion.

During the argument to the jury counsel for the prosecution turned to plaintiff in error Butler and said, "You miserable wretch." This was objected to and the objection sustained, the court stating to the jury that those words were not proper and that they should not consider them. It is complained that this was prejudicial. While counsel have the right, in argument to the jury, to draw any reasonable deduction from the facts proven that they see fit, and have a right to depict the defense in any light that in their opinion the evidence warrants and to characterize the defendants and their acts in any manner justified by the evidence, it is improper for counsel to direct his remarks personally to a defendant. The court promptly sustained an objection to this statement and instructed the jury to disregard it. The jury would be exceedingly unmindful of their duty if they should allow such a circumstance to work harm after the ruling of the court. In any event the action of the court cannot be complained of, as the ruling was in favor of plaintiffs in error.

Complaint is made of the giving of six instructions on behalf of the People. The tenth instruction stated, in substance, that if the jury believed that Minnie Madge was a woman pregnant with child, and that the defendants, "by means of any instrument or other means whatever," caused Minnie Madge to abort or miscarry, and that the abortion was not necessary for the preservation of her life, and that she died as the result of such abortion, the defendants would be guilty of murder. Complaint is made of the language quoted, on the ground that no proof was made on the part of the prosecution of any fact that tended to show the commission of the crime except by means of some instrument, and it was error to instruct the jury that they might find that the abortion was committed by any means whatever. The proof on the part of the People did

tend to show that the abortion was produced by the use of an instrument which had punctured the womb. The evidence also strongly tends to show that plaintiffs in error had entered into an agreement and formed a common understanding to produce an abortion upon Minnie Madge. It is conceded that she did abort or miscarry and died as a result thereof. The evidence of the actual commission of the crime is wholly circumstantial. No attempt was made to prove the exact means by which the abortion was produced. Under the charge made in the various counts of the indictment and the whole of the evidence in the case this instruction was a proper one to be given. The same objection is made to instruction No. 16.

Instructions 11, 12 and 13 consist of definitions of the term "reasonable doubt." They state at length what a reasonable doubt does and does not consist of. The definitions incorporated in these instructions have been repeatedly approved. While it was not error to give them, they were no doubt somewhat confusing, and, as we have had occasion to say heretofore, could serve no useful purpose, as it is doubtful whether any better definition can be given of this term than the words themselves.

The fourteenth instruction was on the question of the credit to be given the testimony of plaintiffs in error, and is substantially the same instruction as was approved in *Maguire* v. *People,* 219 Ill. 16, where the authorities in support of the giving of such an instruction were discussed.

Plaintiffs in error offered fifty-two instructions. Of these sixteen were given as asked, two were modified and thus given, and thirty-four were refused. Complaint is made of the refusal to give nineteen of these instructions and to the modification of one of them. A number of them covered the same ground as the instructions given. Many of them dealt with the same subject and were different only in the phraseology used. A number of them assumed that matters which had been excluded by the court

were in evidence, and others were clearly wrong. In the sixteen instructions given on behalf of the People and the eighteen given on behalf of plaintiffs in error the jury were fairly, fully and correctly instructed as to the law of the case, and we will not enter into a detailed discussion of the refused instructions. It was an imposition on the trial court to ask him to pass upon such an unreasonable number.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE VICKERS, dissenting.