STATE, RESPONDENT, *v.* MORAN ET AL., APPELLANTS.

(No. 4,339.)

(Submitted April 28, 1919. Decided May 17, 1919.)

[182 Pac. 110.]

*Criminal Law—Confidence Game—"Bunco"—Evidence.*

Confidence Game—Evidence—Sufficiency.
    1. Evidence *held* insufficient as to one of two defendants charged with "bunco," or the confidence game denounced by section 8684, Revised Codes, and sufficient as to the other.
Same—Essence of Crime.
    2. The essence of the crime of "bunco," or confidence game, is deceit and false pretense of which the injured party has no suspicion, upon which he relies and upon the faith of which he parts with his property.
    [As to what is a confidence game, see note in 134 Am. St. Rep. 364.]

*Appeal from District Court, Cascade County; J. B. Leslie, Judge.*

FRANK MORAN and Jos. J. Burke were convicted of the confidence game, and they appeal. Affirmed as to Burke; reversed and remanded as to Moran.

*Messrs. O'Leary & Doyle,* for Appellants, submitted a brief; *Mr. W. F. O'Leary* argued the cause orally.

Because of the lack of authorities construing section 8684, Revised Codes, and the lack of statute similar to ours, we are confined to the law of obtaining money under false pretenses to determine what proof is necessary under the information in this case.

Corpus Juris defines bunco when used as a noun, as a swindling game or trick by which two or more confederates decoy a stranger to a house for the purpose of robbing or of fleecing him. Bunco, as a verb, a swindle by the game of bunco, or a similar manner. Bunco game, a trick, artifice or cunning, calculated to win confidence, and to deceive, whether it be by conversation, conduct, or suggestion. (9 Corpus Juris, p. 1004.) "Bunco game" is defined as follows: "A swindling operation by which advantage is taken of the confidence reposed in the swindler, the obtaining of money by the means or use of something false." (*State* v. *Ferrato,* 72 Wash. 112, 129 Pac. 898.) It is therefore seen that the charge of obtaining money under bunco or by means of a confidence game is practically the same as obtaining money under false pretenses, and the proof required under one would also be required under the other. One of the essentials of an information, charging the crime of obtaining money under false pretenses, is the allegation that the pretense or representation was false. (19 Cyc. 425, par. (III).) It is also necessary to prove every allegation in the information which is essentially descriptive of the offense. (19 Cyc. 438.)

It is well settled that under a charge of obtaining money under false pretenses it is necessary to prove the falsity of the pretense. In *State* v. *Lynn,* 89 Wash. 463, 154 Pac. 798, it was held that it is incumbent upon the state to prove that the representation made was false. Many cases holding similarly might

be cited upon that proposition. Our own supreme court, however, has passed upon the question in the case of *State* v. *Taylor,* 51 Mont. 387, 153 Pac. 275.

Upon the question whether or not it is necessary to prove the falsity of the representations made it may be said that the very word "bunco" and "confidence game" in themselves imply that the representations must be false. In order to prove it was bunco or a confidence game, it must be shown it was a swindle, and it cannot be shown it was a swindle unless it is shown that the representations were false. On the other hand, if the representations are not false, no matter what they might be, they could not be constituted into a confidence game or bunco.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Woody* argued the cause orally.

Counsel for appellants assume that the crime denounced by section 8684 is that of obtaining money by false pretenses, and is covered by section 8683, but such assumption is erroneous. These two sections relate to and cover entirely separate and distinct crimes. (*Lacey* v. *People,* 43 Colo. 199, 95 Pac. 302.) In the case of *People* v. *Miller,* 278 Ill. 490, L. R. A. 1917E, 797, 116 N. E. 131, the supreme court of Illinois said that the difference between obtaining money by false pretenses and obtaining money by a confidence game is the means by which the money is obtained.

Speaking of the offenses defined by sections 1927 and 2213 of the Missouri Codes, the supreme court of that state said that it was the evident purpose of section 2213 to provide for a class of false pretenses not included in section 1927, and that it was intended to reach a class of offenders known as "confidence men" who obtained the money of their victim "by means of or by the use of some trick or representation designed to deceive, the very essence of the crime being that the injured party must have relied upon some false and deceitful pretense or device

and parted with his property. (*State* v. *Pickett,* 174 Mo. 663, 74 S. W. 844; *State* v. *Wilson,* 223 Mo. 156, 122 S. W. 701.)

"Confidence game" is defined as follows: "Any swindling operation in which advantage is taken of confidence reposed by the victim in the swindler." (Webster's New International Dictionary.) A swindler's operation for robbing or cheating a person whose confidence he has gained; bunco. (Standard Dictionary.) A kind of swindle practiced principally in large cities upon unwary strangers, the swindler, usually under the pretense of acquaintanceship, gaining the confidence of his victim and then robbing or fleecing him at cards or betting or otherwise; bunco. (Century Dictionary.) The Illinois and the Colorado courts in defining the words, "confidence game" have adopted the meaning given such words by Webster's New International Dictionary. (*People* v. *Turpin,* 233 Ill. 452, 17 L. R. A. (n. s.) 276, 84 N. E. 679; *People* v. *Talmage,* 233 Ill. 560, 84 N. E. 655; *People* v. *Depew,* 237 Ill. 574, 86 N. E. 1090; *People* v. *Poindexter,* 243 Ill. 68, 90 N. E. 261; *Lace* v. *People,* 43 Colo. 199, 95 Pac. 302; *People* v. *Mason,* 113 Cal. 76, 45 Pac. 182.) "Bunco" is defined as meaning a swindling game or scheme; a confidence game. (Webster's New International Dictionary.) A swindling game or trick; a confidence game. (Standard Dictionary.) A swindle. (Century Dictionary.)

It may be true that in some cases it is necessary to introduce evidence to prove the falsity of the representations or statements made, but in other cases, of which this is one, the facts proven speak for themselves, and it is not necessary for the state to introduce any other evidence to prove the falsity of the representations or statements. (*People* v. *Strosnider,* 264 Ill. 434, 106 N. E. 229; *State* v. *King,* 88 Minn. 175, 92 N. W. 965; *People* v. *Miller,* 278 Ill. 490, L. R. A. 1917E, 797, 116 N. E. 131; *Powers* v. *People,* 53 Colo. 43, 123 Pac. 642; *Fleming* v. *State,* 174 Ind. 264, 91 N. E. 1085; *Elliott* v. *People,* 56 Colo. 236, 138 Pac. 39; *West* v. *People,* 60 Colo. 488, 156 Pac. 137.)

MR. JUSTICE COOPER delivered the opinion of the court.

This appeal is from a judgment of conviction of the confidence game, or "bunco," as denounced in section 8684 of the Revised Codes.

The defendants having decided not to assume the risk of going upon the stand in their own defense, the case rests upon the evidence adduced by the state alone, the substance of which is [1] as follows: The complaining witness came from North Dakota to Montana, using as a means of conveyance an automobile which he intended to sell, and, with the proceeds thereof, engage in farming in a small way. On a Saturday evening, about the last of July, 1917, while sitting on a bench in the city park at Great Falls, the defendant Moran came up and took a seat beside him and started a conversation on the topics of the day. In the course of the talk Adair, the prosecuting witness, told his reasons for coming to Montana, and of his intention of going to Canada to work at harvesting, using as a means of conveyance the automobile above referred to. Moran then told Adair that he had a brother at Edmonton, Alberta, to whom he would write and ascertain about crop conditions, *etc.*, there; that on his return the Monday following he was going out in the country to look at some land, and arranged with the witness to meet him at the Park Hotel on the next Monday between 1 and 2 o'clock, by which time he expected a reply from his brother answering his inquiries relative to conditions in Canada; that they met pursuant to arrangements, and at Moran's suggestion, started to the postoffice "to see if there was any mail for him" (Moran); that on the way there, and near the Western Union telegraph office, Moran, happening to look ahead, saw defendant Burke; Moran remarking: "There is a gentleman I met under peculiar circumstances." They continued walking until they overtook Burke, when Moran, addressing Burke, said: "Hello there, Spokane!" To which Burke replied: "Guess you are mistaken in your man." The three proceeded on, Burke stepping into the Tod Building, where the Western Union office is located. Before reaching the postoffice, Burke again caught up

with Moran and witness, and, renewing the conversation, said: "Say, I'd like to have you explain. You spoke a bit ago as though you had seen me some place. I'd like to have you explain where you met me." Moran then proceeded to relate the condition of opulence Burke was in when he (Moran) had seen him in a Spokane bank, with a "big roll of bills" in his hands, and that, after Burke left, the cashier, a judge, and he (Moran), all three "spoke about Burke having so many bills." At the same time Moran mentioned the fact that he had seen Burke's picture in a Spokane paper in connection with a "big winning" Burke had made, the newspaper stating that a "young eastern plunger" had "cleaned up $80,000" from the Seattle pool-rooms. Burke then said: "You boys are not spotters or detectives, are you?" Adair stated that he was not, and Moran said the same. "Well," said Burke, "It seems as though you know who I am, and I will explain a little. I am working here for a Breeders' Association of New York, placing some money on some horses. We are trying to break up some exchanges that are carrying on in the different cities." The complaining witness, further testifying, stated: "He [Burke] explained a little bit further and started to go away, and Moran spoke up and says: 'Can't you do a little something for us?' Burke pulled out a few bills from his pocket and handed them toward Moran, and Moran says: 'No, I didn't mean it that way,' and Moran pulled a dollar out of his pocket and handed it to Burke and says: 'Can't you get us a little cigar money? Place it on the races?' So Burke took the dollar and says: "Go up the street a few blocks and I will meet you later on.' Burke disappeared and came back later on and gave Moran $2. Then he asked us to come back of the Motor Inn, in the park there, and he would explain more definitely about his business. So we went there and sat down and talked over his business." The witness then testified: That Burke related in detail his connection with the Breeders' Association, whose object was to break up betting exchanges throughout the country by means of information it imparted to agents in different parts of the country through a

code which indicated the name of the horse that would win a particular race on a certain day. That by this means, and the making of large bets, the exchanges would not be able to withstand the losses and would be obliged to go out of business. That he exhibited what purported to be a letter from the International Bonding Company notifying him that his bond in the sum of $30,000 conditioned for the faithful performance by him of his alleged contract with the Breeders' Association of New York had been accepted; also, a letter from the "Owners & Breeders' Association of New York City" informing "Edward C. Ray" (Burke) that he had "committed a grievous error recently, against the instructions given you by this company," and that "a repetition of this error will mean your immediate dismissal from our employ, without notice," *etc.* That he produced a paper which purported to be a code of the association indicating a winning horse for that day. That thereupon Burke asked the witness and Moran if they wanted to place a little money on the races. That in response thereto he and Moran each gave Burke $5 to bet upon the races. That, before leaving to bet the money, Burke cautioned them not to be seen on the street with him (Burke). That his family connections in Pittsburg were "highly respectable," and drew a vivid picture of their chagrin should they learn of his "being in trouble." That he related the story of a friend who, while working in a bank in Salt Lake City, had used some of the bank's money to the amount of several thousand dollars which he was unable to replace. That, under the advice and direction of Burke, he obtained $2,000 and "won" his bet on the races, and got out of trouble without discovery by the bank officials; but that, in his exultation over his good luck, the friend forgot that "better part," discretion, and gave Burke away. That Burke remarked: "That's the way a friend sometimes does you up. You try to help him out, and he goes and gives you away." That Burke left with the two $5 bills to make the bet, and shortly thereafter returned with a $20 bill, and inquired of Adair if he had the change. That witness replied: "No." That Burke then gave the $20 to Moran to get it

changed, telling the latter to give witness $10. That Moran on
his return handed Adair the $10. That Burke was then going
under the name of "Edward C. Ray," or "E. C. Ray," and
Moran under the name of "Charles Grove." That Moran sug-
gested playing more money. That Burke then dispatched Moran
uptown to see if any message had arrived, Moran remarking,
"They ought to be on." That shortly thereafter Moran returned
with a message, whereupon resort was had to the code and the
winning horse found. That Burke, in answer to Adair's inquiry
as to the legitimacy of the transaction, replied that it was per-
fectly legitimate. That witness told Burke he did not want to
get into trouble, and thereupon produced four travelers' checks
for $10 each, one for $20, and a $10 bill, and delivered them to
Burke, the latter remarking that he "hated to go to the exchange
with such a small bet," and suggesting that Moran and witness
put up a check for $1,000 each. That Burke thereupon made
out a check for Moran and asked Moran which bank he should
make it out on, Moran telling him to make it out on a bank in
Pendleton, Oregon. That Burke filled it out and signed Moran's
name as "Charles Grove."

"He asked me what bank I could give a check on, and I told
him I didn't have any money. He said it was immaterial, that
he would take up the checks before they could go through the
exchange; that 'we would make this money on the bet because it
was sure, and there was no danger of the checks going through.'
He asked me what bank to make the check on, and I told him
to make it out to the Fargo National Bank. He filled it out and
didn't ask me to sign my name. He signed the checks and went
down to the exchange with the money and those checks and was
supposed to place it on a horse-race. After a while he came back
and waited for a few minutes." Moran was then sent down to
get the winnings, and "after a while came back and said we had
won the money all right," but that when the man was handing
out the money Moran requested the return of the checks, and
was told by a man at the window of the exchange that "those
checks were foreign checks and would have to go through to see

if they were any good.'' That Moran came back without any money, and ''Burke went for him for getting everything balled up and said he ought to have attended to that part of it. Burke said he had put up a thousand dollars of his company's money also, and of course that was lost, and he had to figure out how to make good to the company. He decided he had better go down to the exchange and see if he could not get it straightened out, and after a while he came back from the exchange with the statement made out on a letter-head that we was to take up those checks the following day. He also had a statement from the exchange on a card 'I. O. U.' so much. That is, that they owed us fellows so much money, and we was to take out the checks—make them good—the following day. He brought these bogus checks back and handed Moran his and the one he made out for me, and we destroyed them.'' Adair further testified that Burke suggested to him that ''Moran and I go to some hotel off the main part of the town here and stay together during the night''; that Moran suggested that they go to the Ben Hotel and that ''Burke advised us to keep away from the main part of down town''; that they finally went to the Hotel Royal and stayed all night, Moran paying the bill; that, before leaving Burke the night before, arrangements were made for Moran and witness to meet him at the Park Hotel at 9 o'clock, but when they arrived Burke had not appeared; that Moran left witness and subsequently came back and told him ''he had lost the money, that is, couldn't get it''; that Burke showed Moran and witness the newspaper clipping he claimed to have cut out of a Spokane newspaper in regard to himself, before witness put up the $70.

On cross-examination, the complaining witness testified that he had told Moran he had a car and had a notion to drive it on the trip to Canada, if the duty was not too much; that Moran said if he would drive up, ''he would make it worth while to go along''; that he put confidence in Burke, or he would not be here; that the Breeders' Association kept Burke informed as to what horses to bet on; that Burke said there was not a chance to lose; that Moran said, ''I don't need to be afraid,'' that Burke was all

right, that was when the money was put up and before it was lost; that he did not know that there was anything said or done by Moran before he put up the $70. Upon being recalled, Adair testified further that Burke gave Moran his membership card to go down to the exchange, saying a man had to have a membership card to get into the exchange; that, when explaining about the membership card, he cautioned Moran not to lose the card because they cost a thousand dollars each, and on betting on the races he brought the "cards back as an exchange card that he got there, after the money was paid, or he claimed that he paid, the exchange gave him a card"; that Moran brought the cards back; that the cards he brought back were similar to Exhibit "C" (Exhibit "C" is the letter, above referred to, from the International Bonding Company informing Burke, under the name of Edward C. Ray, at New York City, that his bond for $30,000 had been accepted); that the cards Moran brought back had the name of "Hunter Club" and "Owl Club" on them; that Moran got the cards from the exchange after the money was put up; and that Moran told him that he had been living at Pendleton, Oregon.

Homer Robinson, a deputy sheriff, testified that he got the grip, which was introduced in evidence, from the chief of police or the sheriff, he did not know which, at Fargo, North Dakota; that the first time he ever saw the defendants was in the sheriff's office there; that Burke claimed the grip and its contents; that coming home on the train Burke wanted to take some things out of the grip; that there were "some particular cards marked that he wanted to take out of the grip"; that he had known Burke for about three years; that he had been residing between Power and Great Falls during that time, a good share of the time in the latter place; that he had known Moran by sight, but had no personal acquaintance with him; saw him around the Fair Hotel in the spring and summer of 1917, with his wife and child; and that Moran and a man by the name of Simmons were the owners of the Fair Hotel, Moran acting as clerk at the time of the happening of this offense.

The sole question for determination upon this appeal is the character and sufficiency of the evidence to sustain the conviction of both defendants for a violation of the statute aimed at the suppression of the offense known as "bunco" or "confidence game," counsel for defendants contending that there is "no evidence to support the verdict or judgment in the case."

The scheme is so old that its origin is lost in antiquity. Its [2] essence is deceit and pretense of which the injured party has no suspicion—a species of dissembling that is made to look like perfect honor. It attracts and ensnares both the greedy and the guileless, for they are equally the prey of the cunning and the unscrupulous. It takes all the forms to which legitimate transactions lend color. As was said by the supreme court of Illinois, in *Morton* v. *People,* 47 Ill. 468: "These devices are as various as the mind of man is suggestive."

The statutes of many of the states are directed against, and are intended to·reach the class of offenders, now well, though somewhat colloquially known as "confidence men" who obtain the money of their victims by means of, or by the use of, some trick or representation designed to deceive. The very essence of the crime is that the injured party must have relied upon some false or deceitful pretense or device and parted with his property. (*State* v. *Pickett,* 174 Mo. 663, 74 S..W. 844; *State* v. *Wilson,* 223 Mo. 156, 122 S. W. 701.) In Illinois it is held that any scheme, whereby a swindler wins the confidence of his victim and swindles him out of his money by taking advantage of such confidence, constitutes a "confidence game." (*People* v. *Poindexter,* 243 Ill. 68, 90 N. E. 261.) *People* v. *Miller,* 278 Ill. 490, L. R. A. 1917E, 797, 116 N. E. 131, decided by the last-named court as late as 1917, upheld a conviction of one Lodavine Miller, under a statute similar to the one under discussion, by the use of a promise of marriage as a means of perpetrating the bunco or confidence game. The court said: "The contention cannot be maintained that Lodavine was merely guilty of the breach of a marriage contract. Her breach of that contract was a mere incident of her false and fraudulent scheme to obtain

from Foulkes his money. She entered into the contract and made her declarations of love and affection and repeated vows that she would keep her promise for the unlawful purpose of obtaining his confidence and his money, and for that purpose only."

*People* v. *Strosnider,* 264 Ill. 434, 106 N. E. 229, was a case similar in many respects to the case at bar. There, one Kirby, a banker, was induced to put up $20,000 for the ostensible purpose of betting it on a horse-race. The bet was to be made at an alleged pool-room in the city of Chicago, the victim being inducted into a room having the appearance of a regularly equipped pool-room, the evidence, however, showing the appliances to have been spurious. There, as here, the money was lost. The defendant was convicted of working the confidence game and swindling Kirby out of $20,000. The pool-room in the instant case seems to have been a pool-room of the mind, for the record is silent concerning its location or description. In sustaining the conviction, the supreme court of Illinois, in the case above, said: "The contention that the verdict is not sustained by the evidence is based upon the assumption that there is no proof that any of the representations made by the plaintiff in error to Kirby which induced him to bet $20,000 on 'Lucky George' were false, and that consequently the *corpus delicti* of the crime with which plaintiff in error was charged was not proven. It may be conceded that there is no direct evidence showing the falsity of the statements and representations made by plaintiff in error to Kirby to induce him to bet on 'Lucky George' at the alleged pool-room, and that it was necessary to prove the falsity of such statements or representations in order to establish the *corpus delicti* of the crime; still, it was not necessary to prove such matters by direct evidence. The *corpus delicti* may be proven by circumstantial evidence. (*People* v. *See,* 258 Ill. 152, 101 N. E. 257; *People* v. *Holz,* 261 Ill. 239, 103 N. E. 1007.)"

In *Powers* v. *People,* 53 Colo. 43, 123 Pac. 642, the supreme court, construing a statute practically identical with ours, said: "The offense aimed at by the statute is obtaining money by

means, or use, of what is false or bogus. The race at Council Bluffs was unquestionably bogus. Bowman having confidence in the integrity of Powers and his ability to win the race, and confiding in his representations, was induced by the latter, on the assurance that he would, and that the race was *bona fide*, to bet that he would win. When these representations were made which induced Bowman to bet, the purpose·of the parties concerned, including Powers, was that he should lose, and thus swindle Bowman. These undisputed facts establish the offense named in the statute." To the same effect are *Maxwell* v. *People,* 158 Ill. 248, 41 N. E. 995; *People* v. *Poindexter,* 243 Ill. 68, 90 N. E. 261; *Hughes* v. *People,* 223 Ill. 417, 79 N. E. 137; 12 Corpus Juris, "Confidence Game,", p. 419.

The evidence before us conclusively shows that the prosecuting witness did not part with his money until his confidence had been firmly placed by a series of incidents ingeniously staged to that end, among which were these: That Burke had given a bond for $30,000 for the faithful handling of large amounts of money for the Breeders' Association, and was otherwise fortified with credentials calculated to convince a mind much less verdant than Adair's; that the Breeders' Association, whose trusted agent he pretended to be, was engaged in the laudable enterprise of breaking up pool-rooms by winning from them amounts so large that they could not withstand the losses, and donating part of the winnings to charity; the scene in the Spokane bank with its cashier, a "judge," and Burke (the central figure) with a "big roll of bills" in his hands; the receipt of a "sure tip" from the Breeders' Association in the shape of a Western Union telegram indicating for that day the winning horse; and Burke's statement that it was a legitimate transaction and that they could not lose. From the record it is clear that the defendants well understood that the success of their designs depended entirely upon their ability to so arouse the cupidity of their victim as to unseat his business judgment, and that this could only be accomplished by screening from the victim throughout the many elements of chance their scheme entailed. Not until after the

announcement by Moran that the money was lost did Adair awake to the realization that he had been duped by what appeared to him a legitimate enterprise. It is not always necessary to a conviction to establish the falsity of every pretense; for, if that were true, every malefactor could escape conviction by blending some truth with his false pretenses. It is enough if the material parts of the pretenses be false, made with intent to deceive the person sought to be wronged and induce him to part with his money, and on the strength of such representations the money is obtained. (*Beasley* v. *State,* 59 Ala. 24.) Webster defines a "confidence game" thus: "Any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler."

Our conclusion therefore is that the conviction of defendant Burke· is sustained by the evidence and should be affirmed.

As to Moran: Had the prosecution negatived the existence of a pool-room in the city of Great Falls, and the genuineness of the message purporting to have been obtained from the Western Union telegraph office—the telegram upon which Adair acted' in intrusting his money to Burke—we might have reached a different result. In the absence of this proof, however, we are of the opinion that the evidence is not sufficient to establish beyond a reasonable doubt that Moran was the confederate of defendant Burke, and therefore as to him the judgment should be reversed and the cause remanded, with directions to grant a new trial. It is so ordered.

MR. CHIEF ·JUSTICE BRANTLY: I concur in the result, though I think, with Mr. Justice HOLLOWAY, Mr. Justice COOPER fails to distinguish clearly the crime of practicing a confidence game from that of obtaining money or property by means of a false and fraudulent pretense. The two crimes are wholly distinct. (Rev. Codes, secs. 8683, 8684.)

MR. JUSTICE HOLLOWAY: I agree with the result reached, but not with all that is said in the opinion. ·Much of the discussion

is more appropriate to a consideration of the crime of obtaining money by false pretenses, defined by section 8683, Revised Codes. Obtaining money by means of a confidence game is a distinct offense condemned by section 8684.

There is evidence in the record, in addition to that stated above, which, with the evidence narrated, is sufficient in my opinion, to establish the guilt of defendant Burke.

Rehearing denied June 20, 1919.