STATE OF MONTANA, Plaintiff and Respondent, v. JAMES HALE, Defendant and Appellant.

No. 9891.

Submitted May 26, 1958. Decided August 7, 1958.

328 Pac. (2d) 930.

132

W. E. Coyle, Lewis F. Rotering, Butte, argued orally for appellant.

Forrest H. Anderson, Atty. Gen., Wm. F. Crowley, Jas. A. Robischon, Asst. Atty. Gen., Chester L. Jones, County Atty., Virginia City, Wm. F. Crowley and Jas. A. Robischon argued orally, for respondent.

MR. JUSTICE BOTTOMLY:

James Hale was convicted by jury, in the district court of the fifth judicial district, in and for the County of Madison, of a felony. The charging part of the information being as follows:

"That on or about the 10th day of July, 1957, the said James Hale did in the County of Madison, State of Montana, wilfully, wrongfully and feloniously win money from Robert Emmons

by use of a game designated as Morocco, commonly known as a confidence game   *   *   *   ,'' contrary to the provisions of R.C.M. 1947, section 94-2406. The defendant Hale appeals.

The facts upon which this case arose are as follows:

On July 10, 1957, two members of the attorney general's staff, Robert Emmons and Thomas Hanrahan posing as tourists drove to what was advertised as a ''Free Zoo'' located along highway No. 1, in Madison County, Montana, on the road between Ennis and West Yellowstone, Montana. In their guise as tourists their car was filled with various sports paraphernalia. Arriving at the Free Zoo they entered one of the buildings and ordered soft drinks. There they observed defendant James Hale, and one other person. It was noted at that time by Hanrahan and Emmons that these two people entered into a discussion and that subsequent to the discussion the other party left the defendant Hale, went outside and inspected the car in which Emmons and Hanrahan had arrived. After completing the examination of the car the other person reentered the building and again talked to the defendant. It was after this that the defendant Hale accosted Emmons and Hanrahan and offered to show them the various exhibits in the zoo. While Emmons and Hanrahan were considering this proposal and discussing it with Hale a third party, later identified as one Knapp, entered the building. Emmons and Hanrahan upon their arrival at the zoo had observed that Knapp had been parked outside of the zoo in a car. After their arrival they had observed that Knapp had driven away from the zoo, turned around, and then came back to the zoo and entered the building.

When Knapp entered the building he joined in the conversation between the defendant and Emmons and Hanrahan. Upon learning that they were about to take a tour of the zoo he asked if he could join them. Knapp at all times indicating by his manner and demeanor that he had never seen the zoo before, that he was a complete stranger to the defendant Hale, and that he Knapp had just arrived at the zoo. It was later shown that Hale and Knapp were old carnival friends.

Hanrahan and Emmons accepted Hale's offer to show them the zoo, and at Knapp's insistence he also was allowed to accompany them. After being shown the exhibits, Hale directed the attention of Emmons and Hanrahan to a shack wherein some Indian blankets were displayed on the wall. In this shack there was also a table covered with an Indian blanket. Hale made conversation with Emmons and Hanrahan about the Indian blankets and told them if they would look out in the back toward the fields they would see various corrals where he explained numerous Indians who abounded in that region came every Saturday to play a gambling game which he called "Morocco." Emmons and Hanrahan expressed interest in this game whereupon Hale removed the blanket from the table, exposing two boards. One board contained something over 100 small holes, each separate hole bearing a number from 1 to 6. The second board had painted on it various colored squares which squares were also numbered. It was explained that the game was played by rolling some eight marbles onto the first board containing the small holes. The marbles would roll into the various numbered holes and the numbers would then be added to obtain the player's score. Having obtained a score the player then referred to the second board which listed all possible totals that could be rolled. All the numbers on the second board had colors. There were some four different colors, red, blue, green and black. It was explained that if the number rolled was a red color it was a winning number, if it were a green or blue color it gave the player a free roll. If it were a black number, or the number 29, it meant that the player had to double his bet. Refusal to double his bet meant that the player forfeited his money. It was alleged that since there were no losing numbers there was no risk of loss.

After the explanation of the game Knapp expressed a desire to play. He produced $5, which Hale asserted was the minimum bet. Handed the cup containing the marbles to Emmons, Knapp said, "You look lucky, you roll." Emmons rolled the marbles and they fell into numbered holes which Emmons and

Hanrahan testified totalled 37. However, Hale quickly picked
up the marbles and announced that Emmons had rolled 43
which was a winning number and that Knapp thereby had
won $20.

After playing once and winning Knapp headed for the door.
Just as it appeared he was about to leave however he turned,
came back and insisted that since Emmons had been lucky for
him, he, Knapp, would put up $5 for Emmons to bet with. All
the time he insisted that both Emmons and Hanrahan should
get into the game and share his good fortune. Emmons con-
sented and rolled the marbles. His score was 29 which required
that both the player and the operator double the amount of their
previous bets. Emmons then put in $10 of his own money and
the defendant Hale matched his bet of some $20 or $25 for the
next roll. Emmons then rolled a green number which was a
free roll. On the next roll Emmons and Hanrahan testified
that the total was 30 but the defendant Hale counting the score
rapidly announced that the total was 29 and quickly picked up
the marbles. This score of 29 required that Emmons again
double his bet. This was done with Emmons and Hanrahan each
putting up half. During all of the rolls Emmons was required,
in order to play the game, to watch both boards, count the num-
bers rapidly and at the same time would be distracted by Hale
with a steady rapid fire stream of conversation—buncombe
talk. Emmons rolled twice more and each time rolled a black
number being required thereby to double his bet. When the
investment of Emmons and Hanrahan reached the sum of $50,
and a black number had again been rolled, Emmons refused to
go further and the defendant Hale took all of the money. Dur-
ing the play Emmons and Hanrahan testified that in two in-
stances Hale fast-counted them and proclaimed they had rolled
a different total than they had actually scored.

At this point Knapp, who had been watching the game of-
fered to take over Emmons' bets but was then informed by
Hale who consulted a card upon which various rules were writ-
ten that the rules forbid any player to take over another's bets.

Knapp then drove away from the zoo in his car. Emmons and Hanrahan left the zoo and proceeded on to West Yellowstone where they contacted other members of the attorney general's staff. They informed them that they had played the game "Morocco" at the Free Zoo, and pursuant to such information complaints were sworn out by the county attorney of Madison County.

Upon these complaints Knapp and two other men were taken into custody July 10, 1957. When apprehended Knapp was carrying the keys to various locks of the Free Zoo and had the two boards, the marbles, and the marble cup used in playing the game of "Morocco" at the Free Zoo in his car.

The defendant Hale was arrested August 10, 1957, he plead not guilty, was tried and convicted. On this appeal from such conviction defendant Hale sets forth only three specifications of error and contends that:

The judgment or verdict of the district court is in error because in order to convict where the defendant is charged with the use of a confidence game it is a necessary element of the crime to show that confidence was reposed by the victim in the person operating the game; that since this confidence by the victim in the operator of the game was not shown, therefore it is the contention of defendant the judgment should be reversed.

Is it essential that the state prove that confidence was reposed in the defendant operator of the game by the player in order to sustain a conviction *for using* or *winning money* by any game commonly known as a confidence game *within the provisions of R.C.M. 1947, section 94-2406.*

R.C.M. 1947, section 94-2406, provides as follows: *"Brace and bunco games prohibited.* Every person *who uses* or deals with or *wins any money* or property by the use of brace-faro, or of any two-card faro-box, or any brace roulette-wheel or roulette-table, or any brace apparatus, or with loaded dice or with marked cards, or *by any game commonly known as a confidence game or bunco,* is punishable by imprisonment in the state prison not exceeding five years." Emphasis supplied.

It should be noted that the penalty of violating this statute is imposed upon every person *who uses* or *deals with* any game commonly known as a confidence game or bunco, as well as one who wins.

It is important to note that there is another statute in the criminal codes dealing with confidence games, being R.C.M. 1947, section 94-1806, which provides:

*"Confidence games. Every person who obtains or attempts to obtain* from another any money or property, by means or use of brace faro, or any false or worthless checks, or by any other means, artifice, device, instrument or pretence, commonly called confidence games or bunco, is punishable by imprisonment in the state prison not exceeding ten years."* Emphasis supplied.

The legislative history of these two sections is enlightening and demonstrates that they were enacted at different times. R.C.M. 1947, section 94-1806, was enacted in 1895, R.C.M. 1947, section 94-2406, was enacted in 1907. A close examination of the statutes shows a basic difference. By section 94-1806 the Legislature has declared it a crime *to obtain or attempt to obtain money* by the use of a confidence game.

By section 94-2406 the Legislature has made it a crime *to use* or deal with a confidence game or bunco. In addition an examination of the games described in each section shows the legislative intent to prohibit in section 94-2406 any person who uses or deals in a confidence game which is entirely different condition and different facts than the confidence game that is described in section 94-1806. Each statute covers a separate and distinct crime with separate and distinct penalty.

The confidence games described in section 94-1806 are those ▉▉▉▉ whereby an elaborate scheme is developed to play upon the credulity or sympathy or some other trait of the victim. These confidence games there described often require detailed and complex plots and time to support and mature their elaborate scheme. It has been held by this court and in numerous other jurisdictions that under this type of a statute it is essential to a conviction that it be proved that the victim reposed

confidence in the accused. But it is obvious that section 94-2406 is directed to an entirely different form of confidence game. Those games described in section 94-2406 do not depend upon the active or passive emotions of the victim. Such games are those purported gambling devices so contrived, although masked as legitimate operations, to bilk the victim of his wager by manipulation. The two-card faro-box, brace roulette-wheel and loaded dice are mechanically fixed games in which it is so arranged by the mechanism that you never give the victim any break. Of the same ilk are the old shell game, three-card monte or other sleight of hand or manipulated games which effect the same result, all accompanied by fast work, fast count and, buncombe talk by the operator. Thus, it is seen that the obvious reasons of the two statutes separate and distinct but both relating to confidence games, is to outlaw two entirely different forms of confidence games. In those confidence games condemned by section 94-1806, supra, the reason that the victim parts with his money or property and gives it to the swindler, arises out of the confidence reposed by the victim in the swindler. This element of confidence must be present in order to maintain an action under section 94-1806, R.C.M. 1947, and this has been recognized by this court in State v. Moran, 56 Mont. 94, 182 Pac. 110, and State v. Allen, 128 Mont. 306, 275 Pac. (2d) 200.

But section 94-2406 is designed and directed to outlaw the other type of confidence game. In the sleight of hand, fast count, fast buncombe talk or mechanically contrived swindle, confidence and the integrity of the operator or swindler is not the reason that the money is taken from the victim. Rather the mechanical operation of the contrivance, the operator's sleight of hand or skillful fast count and talk constitutes the means by which the victim is cozened, and the very use of the means shows the intent to swindle the victim. The operator does not rely upon his ability to gain the victim's confidence and then defraud him, time is too short in such operations, but he depends upon his own or mechanical dishonesty as the means to accomplish his result.

Where, as here rogues conspire to get away fast with a person's money, by the use of such games, apparatus, fast count, buncombe talk as testified to herein, it is not necessary, reasonable nor permissible under our statute, section 94-2406, supra, to draw or exercise metaphysical distinctions to save such thieves from punishment.

Section 94-2406 has never been interpreted by this court. Very few states have both these types of statutes as does Montana. Missouri and Kansas have both enacted similar statutes as our section 94-2406, and both of these courts have ruled upon their statutes. The Missouri statute provided:

"Whoever shall, in this state, deal, play or practice, or be in any manner accessory to the dealing, playing or practicing of the confidence game or swindle known as three-card monte, or of any such game, play or practice, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by a fine not to exceed five thousand dollars, and by confinement in the penitentiary not less than two or more than five years." V.A.M.S., section 561.700.

The case of State v. Edgen, 181 Mo. 582, 80 S.W. 942, 944, involved a conviction under that statute. There a person representing himself as a banker and a confederate attempted to entice one, Sims, into playing a game of three-card monte. The alleged banker pretended that he did not know the confederate and that the confederate was a stranger to him. The confederate while conversing with Sims and the purported banker, commenced to show them the game of three-card monte and asserted he had lost money playing it with others. He then offered to bet he could beat Sims and the banker at the game, and when the banker matched his bet the banker won. The operator then attempted to get Sims to play for larger stakes. Sims refused and would not continue to play. The Supreme Court of Missouri upheld the conviction even though the complaining witness never bet or lost any money. There as here the contention was made that an essential element for conviction was proof that the victim had reposed confidence in the

swindler. The court rejected that argument and held: "The statute is leveled at *playing* it, and *practicing* the game and the guilt of any person violating it in no way depends upon whether or not money or property was bet upon it." Emphasis added.

*The dissenting opinion in that case, relied upon by the appellant, would hold an essential element of the crime is that of first securing the confidence of the witness.* This contention was rejected by the majority opinion of the Missouri Supreme Court.

Kansas with an identical statute to Missouri interpreted their statute in State v. Terry, 141 Kan. 922, 44 Pac. (2d) 258, 259. Speaking of the intent of the statute, the Kansas court said: "It is clear this statute *was aimed directly at 'the confidence game or swindle* known as three-card monte,' or 'any such game, play or practice.' *It made any one who participated in such a game guilty of a felony* and subject to severe penalties. Its obvious purpose was to *stamp out that game, or any such game.* It was not aimed at fraud or deceit in the many forms that might be practiced, or at gambling devices, or at gambling generally, for we already had many sections of our statutes dealing with those matters." Emphasis supplied.

Thus, they also rejected the contention raised here by defendant, that the element of confidence reposed in the operator by the victim was a necessary element of the crime under that type of statute.

The Montana statute, R.C.M. 1947, section 94-2406 has the same purpose as the Missouri and Kansas statutes, that is, to prohibit *the use* of or the dealing with any of these games which are bad in themselves. The intention is to eradicate them. The state proved that this operation was a well-planned, detailed and elaborate swindling operation, aimed at fleecing tourists traveling through Montana. Every element of the classic fast count, fast-talk buncombe game was present. The victims were carefully screened to make sure that they were actually tourists and not Montana residents. This because of the fact that the tourist who complains after he has been bilked of his money, finds that the necessary time and expense to successfully prose-

cute such swindlers is generally more than he can afford. He has to charge up his loss to experience, resolve never to visit the State of Montana again and then go on his way.

A steerer was employed in order to see that the game commenced and that the prospective victims became interested in the game and participated in it. He engaged in the play himself to indicate how easy it was to win the money, his every action was for haste. The game itself is nothing more than the old carnival swindle known as the "county store," or "fast-talk buncombe." It is but another form of the old shell game, three-card monte or any of the many varieties of skin-game which were worked upon unwary people before and after the turn of the century.

The player must constantly watch two different boards, he must count the marbles immediately after they roll and at the same time be looking to see what the total roll entitled him to. He is subjected during all of this time to the rapid fire conversation of the operator, he has eight marbles rolling over 100 holes, all of these holes have numbers from 1 to 6 making possible a variety of totals. Such conditions lend themselves perfectly to a fast-count bunco artist. This is the very type of game which the Legislature intended to prohibit when in the enactment of section 94-2406 they said: *"Every person who uses or deals* with * * any game commonly known as a confidence game or bunco, is punishable by imprisonment in the state prison not exceeding five years." Emphasis supplied.

Emmons and Hanrahan did not place any confidence in the ██ operator of the game, but reposing of confidence by the victim in the operator is not a requirement for a conviction under this statute. The game of "Morocco" is a fast-count game. It is a confidence game, it is a bunco game, bad in itself, and it has been conclusively proved that the defendant Hale *used* and dealt with this game to *win money* from his victim; these are all the elements necessary for the State to prove, to support a conviction of the crime prohibited by R.C.M. 1947, section 94-2406.

142

The jury heard the evidence in the case and found the defendant guilty of the crime charged in the information. A judgment of conviction was duly entered on the jury's verdict and in our opinion the evidence amply sustains the same.

It takes a crooked player to make a crooked game, and the law, section 94-2406, as written by the Legislature, is aimed at such person who uses or deals with any such game and not so much against the inanimate paraphernalia so used. So any such game which is by the statute outlawed, may be a confidence or bunco game, for the design and conduct of those who *use it gives it its character under the statute.*

The instruction given by the court and complained of by defendant correctly stated the law under section 94-2406.

Finding no reversible error in the record, the judgment of the district court is affirmed.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES CASTLES, ANGSTMAN and ADAIR, concur.