*727 OPINION OF THE COURT
Irving Lang, J.
In France it is an "escroquerie.” In Belgium it is "un jeu essentiellement d’adresse.” In England Lord Alverstone of the King’s Bench called it "sleight of hand and nothing more.” The Canadian court followed England, but the Canadian Parliament outlawed it. American cases are in conflict. Scarne scorns it and Leif ignores it. There are no New York cases on it, but hundreds were arrested for it in New York City in 1977.
It is "three-card monte” and the question to be resolved by this court, previously undecided in this State, is whether it is a known confidence game under New York’s fraudulent accosting statute.
The defendant is charged with fraudulent accosting (Penal Law, § 165.30). The complaint states that "defendant accosted unknown passersby and engaged in conduct of a kind commonly performed in perpetration of a known confidence game, to wit: three card monte. Deponent further observed defendant receive a sum of USC as a wager from another individual. Deponent * * * observed defendant is in possession of * * * three playing cards.”
The statute which the defendant is accused of violating reads as follows: "165.30 Fraudulent Accosting.
"1. A person is guilty of fraudulent accosting when he accosts a person in a public place with intent to defraud him of money or other property by means of a trick, swindle or confidence game.
"2. A person who, either at the time he accosts another in a public place or at some subsequent time or at some other place, makes statements to him or engages in conduct with respect to him of a kind commonly made or performed in the perpetration of a known type of confidence game, is presumed to intend to defraud such person of money or other property.
"Fraudulent accosting is a class A misdemeanor.”
Defendant contends that the complaint fails to allege facts showing an intent to defraud, an essential element of the crime, and therefore should be dismissed.
The People maintain, however, that under subdivision 2 of section 165.30 of the Penal Law, defendant’s conduct is "of a kind commonly * * * performed in the perpetration of a known type of confidence game” and therefore is presumptively fraudulent, validating the complaint.
*728 Thus, if three-card monte is a "known confidence game” under New York law, the complaint survives the challenge. If not, it must be dismissed.
Webster’s Seventh New Collegiate Dictionary (1963) defines three-card monte as follows: "a gambling game in which the dealer shows three cards and then shuffles and throws them face down before anyone who wishes to pick out a particular card.” Hence it is a variation of the old "shell game” (thimble-rig) with cards substituted for cups, under one of which (purportedly but most often not) is a pea.
The skilled monte dealer verifies the adage that the hand is quicker than the eye and provides practical proof of Heisenberg’s uncertainty principle. The odds are clearly two to one against the player, but some dealers are so good at this trompe 1’oeil that they induce the bettor to specifically pick a wrong card rather than guess one out of three, thus increasing the odds against the bettor.[1]
But it was not merely concern for the player against the monte dealer’s legerdemain that caused men like John Scarne to call it "the most popular con game of the old West * * * it is a swindle, not a game” (Scarne, Complete Guide to Gambling, pp 520-524).
Not content to have the odds two to one in their favor, history and practice reveal a number of swindles and hustles in order to insure the operator’s success. "[T]he manipulator of the game frequently became so skilled in his sleight-of-hand performances that the 'court-card’ would be held in the palm of his hand, or slipped up his sleeve, without being noticed by the 'victim,’ so that any card the victim picked up from the table was certain not to be the court-card, with the result that he was sure to lose.” (State v Terry, 141 Kan 922, 924.)
Again, the use of confederates or "shills” was and probably is the most frequent form of ripping off the bettor. The shill’s participation might range from convincing the player that the dealer is unskilled to pretending to have made a "winning” bet previous to the player (thus causing the dealer to graciously declare a misdeal) to getting the player to believe that the shill has bent the court card and therefore has a sure *729 thing. (For a demonstration of the last variation see Scarne, supra, and The Flim-Flam Man, starring George C. Scott.)
It is, of course, these variations on the basic theme that have caused divergent views of three-card monte in courts throughout the world.
While this State has no reported cases on the character of three-card monte, the game has had a lengthy association with the law in the rest of the western world. The earliest reported cases interpreting the oldest statute are from France, where "bonneteau” (three-card trick) has been declared an "escroquerie” (swindle) since 1881 (C Pen, § 405; [1882] S Jur II, 52 [Cour d’Appel, Paris].)
Reaffirming this position, the highest French court has said that "The game consists in shuffling three cards in such a manner as to give the players the illusion of almost certain gain to be had, but which can be realized only at the will of the dealer and not, as is falsely claimed, by chance. By this means, the dealer nourishes the hope of impossible gain” ([1958] Bull Grim 1027).
Opposed to the French view are those of the Belgian and British courts. Belgium, under virtually the same generally worded false pretenses statute (C Pen, § 496), considers three-card monte "primarily a game of skill” ("un jeu essentiellement d’adresse”). [1885] Pasic III, 224 [Cour d’Appel, Bruxelles]). However, the conviction was upheld because an abuse of confidence was found in arranging for confederates to win in order to build false hopes among the real players.
England is much less equivocal in declaring "three-card trick” a game of skill. In the leading case of Rex v Governor of Brixton Prison (3 KB 568) the King’s Bench refused to authorize an extradition to Norway in a monte caper.
As Lord Alverstone, C.J., asserted (p 570): "What is known as the three card trick is a game in which one player backs his ability to indicate the position of a particular card, and the other player by sleight of hand and quickness of movement in manipulating the cards in such a way as to deceive the eye induces the former to indicate the wrong card. That in my opinion * * * is sleight of hand and nothing more”. Indeed, the English court went further than its Belgian counterpart in holding that (p 570) "fraudulent conduct whereby the prosecutor is induced to play and which is preliminary to the playing itself is not sufficient to constitute an offense” thereby ruling *730 that any ruse undertaken to lure a player into the game was irrelevant.
Moving further westward, in Canada, Bex v Rosen (61 DLR 500) followed the English case, while citing the Belgian position (supra) and distinguishing French cases based on the differences in the underlying statutes. However, the Canadian Parliament took care of the Canadian court by specifically outlawing three-card monte (11-12 Geo 5, ch 25, § 7 [1921]).
The Canadian statute was preceded in the United States by the actions of several States outlawing three-card monte as an evil in itself. (Illinois [111 Rev Stat, 1874, p 348, div 1, § 100]; Missouri [1874 Mo Stat, p 50, § 1]; Kansas [1876 Kans Stat, ch 81, § 1]; Minnesota [1877 Minn Stat, ch 130, esp § 4]; California [1877 Cal Stat, p 8]; Montana [1887 Mont Comp Stat, § 208]; the District of Columbia [31 Stat 1331, ch 854, § 867, 1901], and Arizona [1913 Ariz Sess L, § 533]) — all made the obtaining of property by playing three-card monte subject to heavy penalties, even in the absence of fraud. Typical is the following: "Whoever shall deal, play or practice, the confidence game or the game called top and bottom swindle, three-card monte, bunko, or any similar play, game or practice, or practice any confidence trick not mentioned in this section, shall be deemed guilty of a felony” (Ariz Rev Code, § 4791 [1928]). No doubt these statutes, except in the District of Columbia, were the result of the widespread operation of three-card monte men throughout the developing American West (Nash, Hustlers and Con Men, pp 22-24).[2]
Consequently, all of the American cases considering the character of three-card monte have, until recent times, been grounded in statutes which left no room for deciding whether or not it was a confidence game or swindle but declared it and barred it as one. Thus, in State v Terry (141 Kan 922, supra) the Supreme Court of Kansas upheld the dismissal of a complaint holding that "[f]ive-card stud poker is not 'any such game, play, or practice’ as 'the confidence game or swindle known as three-card monte,’ the dealing, playing or practicing of which is made a felony by R. S. 21-930.”
Two relatively recent cases discuss three-card monte under general statutes and come to different conclusions. Metcalf v State (205 Tenn 598) reversed a conviction and United States *731 v Edwards (516 F2d 913) affirmed a conviction. Significantly the fact patterns are distinguishable.
In Metcalf, the defendants were convicted of larceny by trick in " 'playing a game named Three Card Monte’ ” (p 599). The victims were soldiers at Fort Campbell, Kentucky, who were met at the entrance gate of the post on pay day by the defendants, who on pretense of giving them a ride took the soldiers for a financial ride in monte. Finding (p 602) that the soldiers "did have a chance to win” the Supreme Court of Tennessee reversed the conviction and stated (p 603):
"In the absence of statute, the fact situation in this case is inconsistent with the generally accepted definition of larceny. These soldiers necessarily knew that the manner in which the dealer was dealing these cards was for the purpose of confusing them * * * But they thought they saw where it was put, and based on that thought selected that card, voluntarily surrendering the money placed on the bet if their selection proved erroneous.
"Judging from the many cases annotated in 8A Words and Phrases, under the title, Confidence Game * * * it appears that a number of states have brought the situation described in the instant case within the definition of larceny by statute. But this State has no such statute.”
On the other hand, in United States v Edwards (supra) the Eighth Circuit affirmed a conviction under a fraudulent interstate travel statute where the victim had been taken for $15,000 in monte against a claim that there had been no evidence of cheating. Rationally, the Circuit Court concluded that an intent to defraud could be inferred from the fact that one of the defendants, Edwards, had actually selected the supposed court card on behalf of the victim.
Our findings thus far indicate a split in foreign authority, some jurisdictions holding three-card monte a game of skill and others a confidence game, some per se and others explicitly by statute.
The logical question now is "What is a confidence game under New York law?”
This court has found no New York cases or statutes interpreting the general term "confidence game” but it has a fairly universally accepted meaning.
A "confidence game” is a term of art involving the taking of money by fraud from a victim by means of trick or deception *732 after the victim’s confidence has first been secured through some false representation or deception (State v Carr, 112 Ariz 453).
It is the obtaining of money or property by means of some trick, device or swindling operation in which advantage is taken of the confidence which the victim reposes in the swindler (Black’s Law Dictionary [3d ed, 1933]).
The elements of the crime of "confidence game” are (1) an intentional false representation to the victim as to some present fact, (2) knowing it to be false, (3) with intent that the victim rely on the representation, (4) the representation being made to obtain the victim’s confidence and thereafter his money and property, (5) which confidence is then abused by defendant (United States v Brown, 309 A2d 256, 257 [DC APP]).
While every confidence game necessarily involves false pretenses or ruses, not every false pretense constitutes a confidence game (Clark v State, 53 Ariz 416). The gist of the crime is the obtaining of the confidence of the victim by some false representation or device (People v Friedlander, 328 Ill 35; People v Epstein, 338 Ill 631).
Within this framework there are such classic confidence games as the Spanish Prisoner, the Magic Wallet, the Pigeon Drop, Sir Francis Drake’s Will, and the Pyramid (Ponzi) Scheme. (See Nash, supra, and Leif, Swindling and Selling, The Story of Legal and Illegal Con Games.)
All of these schemes prey on the credulity and/or greed of the victim. Thus, in the Gypsy Swindle, the confidence man (or woman) convinces the mark that he can exorcise the evil spirits which are tormenting him, generally by burning the victim’s money. In a magic-wallet-big-store con, the mark "finds” a wallet, returns it to the "owner,” and refuses a reward. The grateful owner places a bet on a race on behalf of the victim, "wins” and turns over hundred of dollars to the victim. The owner convinces the victim that he is in on a "fix” wherein transmission of race results are delayed to a bookmaking parlor so that a bet on the winner can be made after the race is run. The victim is taken to the betting establishment, bets thousands of dollars on the sure thing and then— "The Sting.”
There are "long cons” (Spanish Prisoner, big store) and "short cons” (Pigeon Drop, handkerchief switch). Nash considers three-card monte a short con while Leif does not even *733 mention monte in his chapter on short cons or anywhere else (see Nash and Leff, supra).
But whether it is a long or a short con, one salient factor is manifest. The essence of the classic confidence game is that the victim views the confidence man as a protagonist, someone on his side. The monte player, on the other hand, always views the monte dealer as an antagonist, someone to beat.
Viewed in this context, there is no real distinction between Metcalf and Edwards (supra). In Metcalf, no classic confidence game took place. It was merely a straight monte operator’s victory. In Edwards, however, a confidence game swindle occurred, the confederate who picked the wrong card playing the role of the confidence man.
What has emerged, therefore, in American jurisprudence are two forms of confidence games: the classic confidence game involving a more or less elaborate plot to gain the confidence of the victim as a prelude to a swindle and carnival hustle swindles such as the shell game, three-card monte, two-card faro box, brace wheeled roulette and loaded dice which have been denominated as confidence games by statute.
This dichotomy is clearly illustrated in the case of State v Hale (134 Mont 131). In Hale, the Montana Supreme Court upheld a conviction for operating a game called "Morocco” under a statute penalizing every person who uses or deals with or wins any money by any game commonly known as a confidence game or bunco. The defendant claimed on appeal that since no evidence was adduced to show any confidence reposed by the victim in the operator, the conviction should be reversed. The court held, however, that two different statutes were involved.
Under section 94-1806 of the Revised Code of Montana of 1947, entitled "Confidence games”, Montana made punishable the obtaining or attempting to obtain property, by "artifice, device * * * or pretence, commonly called confidence games or bunco” (State v Hale, supra, p 137). The court held (pp 137-138) that "The confidence games described in section 94-1806 are those whereby an elaborate scheme is developed to play upon the credulity or sympathy or some other trait of the victim * * * under this type of a statute it is essential to a conviction that it be proved that the victim reposed confidence in the accused.”
Nevertheless, the court pointed out that the defendant was not convicted under this classic confidence game statute. *734 Rather the defendant was charged with violating section 94-2406 of the Revised Code of Montana of 1947 entitled "Brace and Bunco games prohibited.” The statute provides that " 'Every person who uses or deals with or wins any money * * * with loaded dice or with marked cards, or by any game commonly known as a conñdence game or bunco, is punishable’ * * * Emphasis supplied.” (p 136).
The court held (p 138) that it was obvious that section 94-2406 is directed to "an entirely different form of confidence game * * * Such games * * * bilk the victim of his wager by manipulation * * * [o]f the same ilk are the old shell game, three-card monte or other sleight of hand or manipulated games which effect the same result, all accompanied by fast work, fast count and, buncombe talk by the operator.”
Montana has two statutes to cover the two types of confidence games discussed above. Does the New York fraudulent accosting statute cover either or both of these situations?
It is evident that the New York statute encompasses only the classic confidence game. The language of subdivision 2 of section 165.30 of the Penal Law creating a presumption of intent to defraud, clearly alludes to the plot type of con game. So does the memorandum accompanying what became chapter 640 of the Laws of 1952 which gave its purpose: "The bill is designed to aid the police in stamping out an ever-increasing number of swindle rackets which include 'pocketbook [pigeon] drops’, 'handkerchief switches’ and other confidence games. There are many variations of these swindles” (NY Legis Ann, 1952, pp 36, 37). The examples given in the legislative memorandum to the fraudulent accosting bill are manifestly of the classic confidence game genre and do not include the carnival type swindle. See Pender v United States (310 A2d 252 [DC App]) holding that "pigeon drop” is not within the three-card monte statute.
In sum, merely alleging the operating of three-card monte does not state a crime under the statute. Palming the court card would constitute a swindle under the statute but that would have to be alleged. The "bent card” ploy would indeed be a classic confidence game, the shill actually becoming the con man. That, too, would have to be alleged. In the instant case no facts are alleged which would justify the complaint.
The defendant’s motion is granted and the complaint is dismissed.
Lest this opinion be viewed as the emancipation proclama *735 tion for the monte[3] sharpie plying his skills on Broadway to an unwary public, his conduct would in my view be a clear violation of subdivision 2 of section 240.35 of the Penal Law— loitering for the purpose of gambling.

. Dean Michael Severn of Columbia Law School suggests that the odds can be reduced to even money if the player rejects what he believes is the court card and selects one of the other two, a proposition logically compelling but psychologically difficult.

. Most of these statutes have been repealed and replaced by other more generally worded laws.

. As used in this opinion monte and three-card monte as defined by Webster (supra) are interchangeable. There is however a different game of Spanish origin called monte and a game of three card poker which is also called three-card monte or three toed pete. (See Scarne, supra.)
The court expresses its appreciation to Maurice Mathis of the Columbia Law School for his research assistance.